NEVELS WEED v. AMERICAN CAR & FOUNDRY COMPANY ET AL., Appellants.—14 S. W. (2d) 652.

Division Two, March 2, 1929.

138

*Watts & Gentry* and *Arnot L. Sheppard* for appellants; *G. A. Orth* of counsel.

*Charles A. Lich* and *Louis E. Miller* for respondent.

DAVIS, C.—This is an action for personal injuries sustained by plaintiff on or about July 1, 1924. The jury returned a verdict in favor of defendants, but the trial court entered an order sustaining plaintiff's motion for a new trial filed, and defendants appealed,

The gist of the amended petition may be briefly stated. The substantive averments are that plaintiff was employed by defendant corporation and was by defendants directed and it became his duty to work upon cars in the course of manufacture. While about his usual and customary duties of driving rivets in a car, (a) that defendants carelessly and negligently moved and caused to be moved the car on which plaintiff was working, when the defendants knew, or by the exercise of reasonable care, could and should have seen and known that plaintiff was in a position of danger and peril; (b) that defendants failed and neglected to warn or notify plaintiff that they intended to move said car forward, so that plaintiff could have gotten to a position of safety and thereby have avoided being run over by said car. The answer was a general denial and a plea of contributory negligence that, by the exercise of ordinary care, plaintiff should and could have walked along in the direction in which the car was being slowly moved, or should and could have ridden on the car while it was being moved, instead of standing still and permitting the car to run over him.

The trial court sustained the motion for a new trial on four grounds thereof. (1) "Because the verdict is so unjust, unmerited and unfounded as to indicate that said verdict is the result of bias and prejudice on the part of the jury against the plaintiff and in favor of defendants. (2) In substance, because the court erred in submitting to the jury various blank forms of verdict, which tended to confuse and mislead the jury. (3) Because the instructions, given on behalf of defendants, conflict with each and every instruction given on behalf of plaintiff. (4) Because each and every instruction given on behalf of defendants does not truly and properly declare the law."

The evidence for plaintiff warrants the finding that plaintiff, a negro man, about twenty-five years of age at the time of trial, commenced working for defendant corporation in August, 1922, as a heater of rivets. These rivets were heated red-hot, and were thus inserted by a sticker, by means of tongs, in holes in box cars under construction. The employee who heated the rivets was known as a "heater," and the one who inserted them in holes, as a "sticker." The rivets were set by an employee called a "riveter" or "driver," who accomplished the work by the use of a pneumatic hammer or air gun in rounding off the rivets. An employee known as a "bucker" held against the opposite end of the rivet a bar of flat iron so that the air gun could act upon it. The defendant corporation was a manufacturer of freight cars. Plaintiff was employed as a heater, but served both as a heater, a sticker and a bucker, as occasion required. On or about July 1, 1924, plaintiff, inside the frame work of a box car under construction, was engaged in driving rivets with

said hammer, while a second employee, Simmons by name, was on the outside of the car acting as a bucker, when the car on which he was working started with a jerk, injuring the *os calcis,* or heel bone, of plaintiff's foot. Plaintiff was employed as a heater, but frequently, that is, two or three days a week, operated the air gun in driving rivets. He said that a foreman, a defendant, that morning, directed him to drive rivets. The work was done in positions and the cars were moved upon the completion of the work from one position to another. The cars were moved by means of a wire cable attached to a drum, controlled by an electric switch. Before a car was moved, a signal by a lookout or watcher was given to the operator, who first blew the whistle. Plaintiff stated that he did not hear a whistle before the car moved, nor did he know that the car was going to move. However, he was at that time operating the pneumatic hammer, which made a noise. Simmons, the bucker, a witness for plaintiff, said he heard the whistle and waved to Bush, who acted as a lookout for men under cars, not to move the car, but it started and moved two or three feet and stopped. Simmons further said that plaintiff's regular job was heater boy, and he was trying to learn to drive rivets; that all want to do that if an opportunity is given them. The sticker boy was at the side of Simmons at the time the car moved.

Defendants contend that plaintiff's evidence shows that at the time of the injury, plaintiff was not working within the scope of his employment and hiring. In that regard, plaintiff's evidence warrants the finding that plaintiff was driving rivets on the box car to hold in place a door stop. While plaintiff was within the car riveting, the other members of the crew were outside of it. A man by the name of Joe was the regular riveter of the crew of workmen. For two or three months after employment, plaintiff's work consisted of heating rivets. From then until about January, 1924, he worked as a sticker. For probably a week subsequently, he bucked rivets and then commenced driving them.

When asked if he drove rivets regularly, plaintiff replied, ''Yes, sometimes.'' In explanation, he stated that some days he drove rivets. He again stated that he drove rivets two or three or more days a week from January 1, 1924, to the time of injury. Later, on cross-examination, he said that he had driven rivets on six or seven cars a day ever since he had been working there.

He testified that his earnings were from five to eight dollars a day; that riveters averaged six to nine dollars a day, and heater boys six or seven dollars a day, and that he made less than a riveter. He admitted receiving a heater boy's wages. He said that he started driving rivets on that morning and continued to drive rivets all that day until he was injured, which was about five o'clock P. M. Later, he

testified that he drove part of the rivets and that a white man Joe drove part of the rivets, and then said that the white man had driven all the rivets in the car except three, and that he had driven only six or seven rivets the entire day.

Seventy to seventy-five rivets were driven in each box car. When asked how many rivets he had driven on that car, he stated that he had driven two of them, and had one more to drive. He then stated that he drove part of the sixty-seven or seventy-two rivets remaining. He then stated that he had driven all of them in that particular car. Upon being asked if he drove all of them in the car, he stated that he drove part of them, and that the white man drove part of them, and finally said that the white man had driven all rivets in that car except the last three. Later, in his cross-examination, when asked how many rivets he had driven in any other cars that day, he said about six or seven. Succeeding that statement, however, he said that he had driven about twenty-two. He testified later that he had been driving rivets ever since 1922. He admitted, however, that driving rivets was not his regular job.

Defendants' evidence tends to show that the defendant corporation had established a rule requiring the signal man, that is, the man who signals the controller of the electric switch when to move a car, to look under the car to see if anyone is working in or under it before the car is moved. It was the duty of the gang leader to name such signal men, and Ben Bush was so named on this occasion. Bush testified that he did not know that plaintiff was under the car until it started; that after the whistle blew, he did not look around, but gave a signal to move the car; that after the whistle had blown, he did not look to see whether the sticker, bucker or hammer men were out, but he did observe a crowd of men standing at the back end of the car on the east side, and that he "highballed" the controller of the switch to move the car. That he usually gave the "highball" or signal to start the car, and that he did not look under the car before giving the highball or signal to start.

Defendants' evidence further tends to show that one Joe Manzello was the regular riveter, and that plaintiff asked him that day to be permitted to drive the three rivets in the door stop. Bush stated that plaintiff had been heating rivets all day, and that he did not see plaintiff under the car at all that day, and that so far as he knew, Manzello was doing the riveting. Plaintiff's immediate superiors testified that they never at any time told plaintiff to run the air gun, and that they did not know that he could use it, or that he had ever operated a hammer. Such other facts as are pertinent, if any, will appear in the course of the opinion.

144

I. Before determining whether the court *nisi* properly sustained the motion for a new trial on any of the grounds stated, we must first determine the insistence of defendants that plaintiff's evidence failed to develop a prima-facie or submissible case. The position taken is based on the premises that, in driving rivets, plaintiff was not acting within the scope of his employment, and thus was a trespasser, consequently denying him, as a matter of law, the right of recovery.

The uncontroverted evidence for both plaintiff and defendants established not only that plaintiff was underneath and inside the car driving rivets at the time it was moved by the controller of the electric switch, upon the signal of Ben Bush, but that its movement resulted in the injury to plaintiff's heel. Defendants' evidence shows a rule of the corporation in force, requiring the employee, delegated to wave the signal for movement, to look under the car to ascertain if anyone was thereunder before signaling for the movement of the car, and that in this instance Ben Bush so failed to look thereunder before he signaled to the controller of the switch to move the car. Defendants' evidence further shows that just before the car started, the controller of the switch saw Joe, the regular riveter, on the outside and his bucker at the side of the car.

Plaintiff's evidence tends to show that the general foreman directed him to drive rivets, and plaintiff's deposition, introduced by defendants, tends to show that both the gang foreman and the general foreman saw him driving rivets on that day. Plaintiff's evidence also shows that other men were working on the same car during a portion of the time that he was driving rivets, but that they had finished and that he was the only employee working on the car at the time of his injury.

If the foreman directed plaintiff to drive rivets on that day, he was acting within the scope of his employment at the time of the injury; or, if the gang and general foremen observed him driving rivets, and failed to remonstrate, it was for the jury to say whether he was acting within the scope of his employment. Defendants say that these facts were vital to plaintiff, and without them he could not recover. They argue that his testimony is so contradictory that it is plainly perjured and unbelievable as to be without substantive force. We cannot so view the evidence as a matter of law. It was the defendants who brought out, on cross-examination, the facts that White, the general boss, had on a previous occasion told him to run the hammer, and that it was Lippman, the gang leader or boss, who told him to drive rivets with the hammer that day. It is true that, on direct examination, the plaintiff was asked if he had been told what to do, and he replied, "Drive the rivets was all," but it cannot be said from the connection that the question and answer

referred to the order of a superior or master. So far as the record shows, until the defendants drew it out, the order may have been given by some one not authorized to direct him. We think the evidence was of sufficient substance to submit to the jury the question of acting within the scope of his employment at the time of injury.

II. Defendants also maintain that the record is without evidence of negligence on their part. The contention is based on the hypothesis that the signal man and the controller of the switch saw the regular riveter outside the car and in a place of safety, and consequently they, of a right, could assume that the riveting had ceased and that no one was under the car. Experience seemingly had taught the defendants that it was dangerous to life and limb to move a car before the signal man had inspected conditions; hence, the formulation of the rule that he must look under cars before signaling their movement to the controller thereof. The evidence shows by his own admission that he failed to look under the car in this instance. Such omission was negligence.

III. Even though it could be said that plaintiff, in driving rivets, was not acting within the scope of his employment, but was a mere trespasser, yet the facts make a case submissible to the jury, for the defendants had knowledge of facts that would put them upon actual notice that some one was working on the car. The rule applicable may be stated thus: Even though a servant is not acting within the scope of his employment, but has become a mere trespasser, nevertheless it is the duty of the master to refrain from wilful or wanton injury. [39 C. J. 430.] This rule is based on actual notice of existing conditions. What then is meant by actual notice? In Rhodes v. Outcalt, 48 Mo. 367, 1. c. 370, in that regard the court say: "A notice is regarded in law as actual when the party sought to be affected by it knows of the existence of the particular fact in question, or is conscious of having the means of knowing it, although he may not employ the means in his possession for the purpose of gaining further information." Actual notice often means knowledge of facts and circumstances sufficiently pertinent in character to enable reasonably cautious and prudent persons to investigate and to ascertain the ultimate fact. [46 C. J. 539-540.] In 20 Ruling Case Law, pages 346-347, it is said: "Whatever fairly puts a person on inquiry is sufficient notice, where the means of knowledge are at hand; and if he omits to inquire, he is then chargeable with all the facts which, by a proper inquiry, he might have ascertained. This, in effect, means that notice of facts which would lead an ordinarily prudent man to make an examination which, if made,

would disclose the existence of other facts is sufficient notice of such other facts. . . . Where there is a duty of finding out and knowing, negligent ignorance has the same effect in law as actual knowledge.'' Notwithstanding the fact that the signal man saw Joe, the regular riveter, outside the car, it was his bounden duty, in accordance with the rules of the master, to look under the car before waving the controller to move it. He saw or could have seen the bucker at the side of the car. Moreover, the controller, before turning on the switch, saw the bucker at the side of the car. By failing to look under the car in compliance with the rules and as a result of the surrounding conditions, defendants will be held to have had actual knowledge of what the conditions constrained them to ascertain.

Having then actual, or what was tantamount to actual, knowledge of conditions, it may be said that, before moving the car upon him, defendants saw the perilous and dangerous situation in which plaintiff was placed. Even though a trespasser, defendants owed him the duty to refrain from wantonly or recklessly injuring him. Plaintiff, in his petition, predicates his right of recovery on the humanitarian theory, that of starting and jerking the car upon him after they knew plaintiff was in a perilous predicament. The signal man and the controller were clearly within the scope of their employment in moving the car, and in so doing, while the plaintiff was in a perilous situation to their knowledge, culpable negligence resulted. They owed plaintiff the duty of using reasonable care to refrain from injuring him after they discovered or knew his danger or peril was imminent. [Bobos v. Krey Packing Co., 317 Mo. 108, 296 S. W. 157; Stipetich v. Mfg. Co., 218 S. W. 964.] It follows that defendants were not entitled to a directed verdict.

IV. The question remaining for determination is the propriety of the court *nisi* in sustaining the motion for a new trial. The gist of the first assignment on which the court sustained said motion is that the verdict is unjust, unmerited and unfounded. We are of the opinion that the assignment was equivalent and tantamount to saying that the verdict was against the weight of the evidence. As the sentence is constructed, the words, ''as to indicate that said verdict is the result of bias and prejudice,'' merely qualify the words ''unjust, unmerited and unfounded,'' and add nothing to their force, unless they intensify them. As it is peculiarly within the province of the trial court to sustain motions for a new trial on the ground that the verdict is against the weight of the evidence, we refuse to interfere where that ground is stated as the cause. if the record develops a submissible case. [Carnie v. Toll, 281

S. W. 41; Littig v. Urbauer-Atwood Heating Co., 292 Mo. 226, 237 S. W. 779.]

The order of the court *nisi* sustaining and granting the motion for a new trial is affirmed and the cause remanded with directions to proceed in conformity with this opinion. *Henwood, C.,* concurs.

PER CURIAM:—The foregoing opinion by DAVIS, C., is adopted as the opinion of the court. All of the judges concur.