GEORGE S. WOLFERSBERGER v. GEORGE W. MILLER, G. M. HANSEN, MCCANLESS-MILLER REALTY COMPANY, GREGG REALTY COMPANY, WILLIAM D. SNYDER AND GUY H. MCCANLESS, Appellants.—39 S. W. (2d) 758.

Division Two, June 5, 1931.*

*NOTE: Opinion filed at October Term, 1930, March 25, 1931; motion for rehearing and motion to modify opinion overruled April 14, 1931; motion to transfer to Court en Banc overruled at April Term, June 5, 1931.

*Burns & White* and *Rosenberger, McVey & Freet* for appellant Hansen.

*Henry S. Conrad, L. E. Durham* and *Hale Houts* for other appellants.

1154

*C. W. Prince, James N. Beery* and *W. H. Allen* for respondents.

DAVIS, C.—This is a law action for damages for fraud. Twelve parties were originally made defendants, but plaintiff dismissed as to six of them. The cause as to the remaining six defendants was submitted to the jury, and they returned a verdict finding the issues in favor of plaintiff and assessing his damages at $32,561.97. On judgment entered on the verdict, said defendants appealed.

The facts adduced warrant the finding that, prior to 1920, plaintiff owned and operated a farm in Illinois. Disposing of his Illinois farm, he purchased land in and near San Benito, Texas. In 1922, due to conditions, a financial depression existed in that locality. At that time he owned three Texas properties. First, a home erected at a cost of $14,000, free of incumbrance. Second, an eighty-acre farm for which he paid $150 an acre and cleared at an expense of $21.50 an acre, and on which he had erected two houses costing $2900 and $3300 respectively, subject to a $6,000 mortgage. Third, a tract of 140 acres, unimproved, costing $175 an acre, subject to a $6600 mortgage. Irrigation rights were appurtenant to the two farms, with water on three sides. These three investments aggregated $58.420, and were subject to mortgages of $12,600, and in addition, to taxes and interest of probably not over $1,000. While discussing conditions and the depression with a neighbor by the name of Youker, plaintiff concluded that he desired to dispose of his Texas properties, among other reasons that the climate did not seem to agree with his wife. About July 4, 1922, plaintiff was advised by Youker that he was going to Kansas City, desiring to know whether plaintiff would consider trading his Texas properties for flats. Plaintiff informed him that he desired a northern farm, and Youker replied that a trade for flats would be easier, and that the flats later could be traded for a farm. Youker mentioned defendant Hansen as a real estate dealer.

On July 27, 1922, Youker, at Kansas City, wired plaintiff at San Benito that he had worked up a deal on a twenty-four apartment building and to come at once. Plaintiff left immediately for Kansas City and on his arrival met, on a certain morning, Youker and Hansen, and was taken by them to Hansen's office. On inquiry by Youker as to the incumbrances on his Texas lands, plaintiff advised him, whereupon Youker declared that the trade for the twenty-four apartment building could not be consummated, due to the $6,000 mortgage on the eighty-acre tract, which Youker said had slipped his memory. On further inquiry, Youker ascertained that plaintiff desired to trade. Thereupon the Gregg Realty Company was called.

At this point it is well to state that the Gregg Realty Company was a corporation engaged in acting as agent relative to the sale of real estate. The McCanless-Miller Realty Company was also a corporation, engaged in building. It constructed and, at all times herein mentioned, owned the two apartment buildings situated in the 2700 block on East 27th Street for which plaintiff later traded his Texas properties. The Gregg Company was the sales agent of the McCanless· Company. Defendant Snyder was a salesman in the employ of the Gregg Company. Defendant McCanless was a stockholder and officer of both companies. Defendant Miller was a salesman in the employ of the Gregg Company, and had an understanding with McCanless as to an interest in its stock. Miller was also a stockholder and an officer of the McCanless Company. The two companies and Snyder, Miller and McCanless occupied the same suite of rooms in an office building. The same employee kept the books of said companies.

The evidence tends to show that Hansen purported and led plaintiff to believe that he was plaintiff's agent with respect to the exchange of the Texas land for the apartment buildings owned by the McCanless Company. With this relation obtaining, the office of the Gregg Company was called, resulting that Snyder went to Hansen's office. Upon inquiry as to what he had to trade, Snyder mentioned several properties, which they went to view and cursorily examine. Plaintiff was taken by Snyder, Hansen and Youker through an apartment and the basement of the 27th Street property, and, on his return to Hansen's office, informed Hansen and Youker that he liked this property the best. Subsequently, in both Hansen's and the Gregg Company's office a trade was discussed. In the presence of Hansen and Youker, during negotiations, Snyder declared to plaintiff that George K. Adams owned the apartments, that each apartment carried a $12,000 first and a $9500 second mortgage, and that the least they could be acquired for was $79,000 cash. Defendant Miller was then present, having been introduced by Snyder. Miller then stepped away six to eight feet and Snyder went to him and conversed, but plaintiff did not hear what was said. Hansen, while Snyder and Miller were conversing, said to plaintiff, "Why do you hesitate on making a deal like this?" Snyder returned to the conference, declaring that the apartments in the building were under a year's lease at $70 a month, and that the income would carry the expenses, interest and a $4,000 a year payment on the principal of the mortgages and leave a net balance of $1750 a year on each building. Snyder further declared that the Gregg Company was Adams's agent, that Adams had agreed to sell for cash or exchange for $79,000, because he desired to go to a warmer climate and wanted Texas property, and that the buildings alone cost more than $79,000 to construct them. Hansen declared

that he was an experienced real estate agent, that he had no interest in a trade of the apartments other than a commission, and that he knew they were worth $100,000. Plaintiff was shown a circular to the effect that the gross income was $10,280, and he was told that property earning that amount was worth $100,000.

Snyder prepared a contract relative to the exchange of plaintiff's Texas properties for the McCanless Company's 27th Street apartments. The contract, however, for the exchange of said properties was executed by and between plaintiff and Adams, who was a straw person. The evidence tends to show that Adams's signature on the exchange contract was forged, but he declared that he signed deeds to the Texas properties after plaintiff conveyed them to him. Plaintiff did not know that Adams was a straw person, for such fact was concealed by defendants. Plaintiff declared that he relied upon the representations made by Hansen and Snyder, and believed such representations to be true.

On behalf of the owner, the McCanless Company, Snyder presented to Miller the proposition of the exchange of the apartments for plaintiff's Texas properties, and Miller advised him that an exchange would not be considered. Snyder communicated to Hansen the fact that the owner was not interested in an exchange, and suggested that the owner would sell the apartments to him (Hansen) at a reasonable cash price, and that he (Hansen) could then effect an exchange with the plaintiff, and it was orally agreed between Hansen and Snyder that Hansen might have an option of thirty days to purchase the apartments for $6500 cash, subject to mortgages for $43,000. This proposition was communicated to Miller and he agreed to it, understanding that Hansen was the purchaser. He denied that he knew that Hansen was plaintiff's agent. It was after this agreement that Hansen and Snyder negotiated and procured the execution of the contract between plaintiff and Adams, the reputed owner. Pursuant to the oral option agreement, on September 9, 1922, Hansen, in the name of another straw party by the name of Harmon, entered into a written contract with the McCanless Company for the purchase of the equity in the apartments for the cash consideration of $5750. The consideration was later paid by Hansen to the McCanless Company.

At the time of the execution of the contract between plaintiff and Adams, first mortgages, aggregating $24,000, were of record against the apartments. On October 2, 1922, the McCanless Company conveyed the apartments to a straw party, a Miss Gille, who placed on each apartment and plot of ground two second mortgages for $9500 each. A short time after executing the contract, plaintiff forwarded to Hansen in Kansas City deeds conveying his Texas properties to Adams, grantee. At the instance of Hansen, Adams deeded these

Texas properties to one M. H. Davis, a straw party, for Hansen's beneficial interest. Following the clearing of liens on the Texas property and other matters, Miss Gille, the straw party, holding the title to the apartments for the McCanless Company, conveyed the apartment properties direct to plaintiff, thus closing both the sale contract between the McCanless Company and Hansen, and the exchange contract between Hansen and plaintiff, executed, however, between Adams and plaintiff. Some one placed the deeds executed by Miss Gille to plaintiff on record, and plaintiff never had them. The Texas properties, after the exchange, were deeded by Adams to and held for Hansen's benefit by Miss Davis, a straw party. At the time of the trial Hansen had disposed of all the Texas properties conveyed by plaintiff except forty acres. Plaintiff, after taking charge of the apartments, was unable to meet expenses and charges, and finally he lost them.

The books of the McCanless Company show that said apartment buildings cost about $22,000 each to construct them. Miller testified that he was not advised that Hansen was the agent of plaintiff in the transaction, although he knew that Hansen was the party to whom he gave the option contract. He said that he acquiesced in Snyder's suggestion of Adams as a straw party when Snyder advised him that Hansen desired one.

Other facts will be adverted to in the opinion.

I.   The record develops that plaintiff refused to offer instructions except one predicated on punitive damages, which the court refused.

The court, however, prepared and gave to the jury certain instructions. The court's principal instruction, C-1, announced a theory for recovery by plaintiff, and defendants complain of it.

Defendants analyze the instruction as proceeding upon the theory of an accounting for the profits earned by Hansen, to which we agree. At the instance of defendants, except Hansen, the court charged the jury that the evidence failed to establish an issue of fraudulent representations. Consequently, the consideration of that issue was denied the jury. Instruction C-1 covers three pages of the record. Summarized, it directed a recovery against all defendants if the jury found that Hansen was plaintiff's agent, and that Hansen, Youker and Snyder negotiated the exchange of properties, and represented that Adams was the owner of the apartments, all of which plaintiff believed, and that Adams had no interest therein, but the real owner was the McCanless Company, and that the Gregg Company and Snyder were the sales agents of McCanless Company, and that the McCanless Company was unwilling to make the exchange, and Snyder informed Hansen of that fact, and that it was agreed be-

tween Snyder and Hansen that the apartments would be sold to Hansen, and that Miller was so advised, but plaintiff was ignorant thereof, and that plaintiff conveyed his Texas properties to Adams and Adams to Davis for Hansen, and that plaintiff was ignorant that his properties were so conveyed and that Hansen informed Snyder that he represented plaintiff in the matter of the exchange of properties, and that the Texas properties were of greater market value than the apartments, incumbrances considered, and that the jury were authorized to assess plaintiff's damages in any amounts that the market value of the Texas properties exceeded that of the apartments, and that the jury may allow interest.

The theory of plaintiff's petition was an action at law for damages for fraud and deceit. Plaintiff and all defendants so construe it, as shown by their briefs. Instruction C-1 predicates a recovery on the theory of an accounting or money had and received relative to the fraudulent profits of Hansen. Consequently, it is not predicated on the averments of the petition, which alleged, on the part of defendants, a conspiracy and a participation in a fraudulent scheme to deprive plaintiff of his properties by representations, know to be false by defendants, with the present intention that they should be believed and acted on by plaintiff, of which falsity plaintiff was ignorant, and on which representations he relied and acted to his damage. [Judd v. Walker, 215 Mo. 312, 114 S. W. 979; Arthur v. Griswold, 55 N. Y. 400; Simpson v. Burnett, 299 Mo. 232, 252 S. W. 949.] The principal instruction in Leimkuehler v. Wessendorf, 323 Mo. 64, 18 S. W. (2d) 445, pronounces the proper theory of recovery. The instruction involved a theory which constituted a departure from the petition. Therefore it constituted prejudicial error.

II. Each and every defendant-appellant submits that the evidence failed to develop a submissible case.

It appears to be the general doctrine, in fact we have discovered no case to the contrary, that the relationship existing between a real estate broker and the vendor of real estate is that of agency and that the principles governing their respective rights and liabilities are regulated by rules of law applicable to principal and agent. [Judd v. Walker, 215 Mo. 312, 114 S. W. 979; 4 R. C. L. 247; 2 R. C. L. per supp. 1087; 9 C. J. 525.]

According to the evidence, the McCanless-Miller Realty Company owned the 27th Street apartments. Defendant Miller was its vice-president and its active agent relative to the presentation of offers for sale or trade of said apartments, for he refused, upon the presentation of an offer, to consider trading them for Texas land. The relationship existing between plaintiff and Hansen during this period was

that of principal and agent. Snyder then communicated to Hansen the refusal of Miller, representing the McCanless Company, to consider the trade, and immediately suggested to Hansen that he (Hansen) purchase the apartments for $6500 cash (subject to the mortgages for $43,000), and trade them to plaintiff for his Texas lands. That Snyder knew that Hansen was plaintiff's agent, relative to the exchange of his Texas lands, was amply shown by the evidence, for Snyder later prepared or had prepared the exchange contract and inserted Hansen's name therein as plaintiff's agent entitled to a commission. So, when Snyder, without information to plaintiff on the subject, gave Hansen a thirty-day option to purchase the apartments for $6500 cash to afford him an opportunity to agree upon an exchange of properties with plaintiff, a conspiracy on their part to commit a fraud to plaintiff's injury came into existence. Pursuant to the conspiracy to defraud, the evidence tends to show that Snyder and Hansen, in the presence of each other, made certain representations to plaintiff, in conformity with the averments of the petition, as follows:

Snyder represented that each apartment was subject to a first and second deed of trust of $12,000 and $9500, respectively; that the least that they could be acquired for was $79,000 cash; that the buildings alone cost more than $79,000 to construct them; that the income would carry the expenses and interest, would permit a payment of $4,000 a year on the deeds of trust, and would leave plaintiff a net balance of $1750 a year on each building; that Adams was the owner, and because he desired to go to a warmer climate and wanted Texas property, he had agreed to sell for cash or exchange for $79,000. Hansen represented that he was an experienced real estate agent, that he had no interest in a trade of the apartments other than a commission, and that he knew they were worth $100,000.

Verily, the representations that the buildings cost more than $79,000; that the least they could be acquired for was $79,000 cash; and that Hansen had no interest in a trade of the apartments other than a commission were representations of material facts, and, as they were false, according to the evidence, they were fraudulent and actionable, as the other essential elements of fraud, to-wit, *scienter*, deception and injury or damage, were present. Both Snyder and Hansen knew that the apartments could be acquired for much less than $79,000 cash, for they knew, at the time representations were made, that the owner had agreed to sell it to Hansen for $49,500 cash, or its equivalent. They also knew, or ought to have known, which is tantamount to actual knowledge, for the construction books of account were in the office and of easy access, that the buildings cost greatly less than $79,000 to construct. [Weed v. Am. Car & Foundry Co., 322 Mo. 137, l. c. 146, 14 S. W. (2d) 652.]

They also knew that Hansen had an interest in the trade of the apartments other than a commission, to-wit, that of a prospective owner. These representations were false, to their knowledge, and we have no doubt but that they deceived and injured plaintiff. We need not determine that the remainder representations were actionable in themselves, but it is evident that they were admissible as surrounding facts and circumstances, and as a part of the *res gestae*. The representations detailed, in connection with the other elements of fraud in evidence, made a submissible case against Hansen and Snyder, and support the averments of the petition. As Snyder was the employee and agent of the Gregg Realty Company relative to the sale of the apartments, and was then acting in the scope of his employment, it is evident that the representations of Snyder were the acts of said company, resulting that it became a participant in the conspiracy to defraud plaintiff.

III. The McCanless-Miller Realty Company and Miller maintain that, if fraud and conspiracy existed, they were not participants therein.

The evidence relating to their participation in the fraud and conspiracy tends to show by the testimony of defendant Miller that Snyder, acting as salesman for the Gregg Realty Company, presented to Miller, as vice-president of the McCanless Company, photographs of plaintiff's farm land and house in San Benito, asking him if he would consider trading for these Texas properties. Miller advised that he would not. Subsequently, but prior to plaintiff agreeing to and executing the exchange contract with Adams, Snyder, acting as salesman for the Gregg Realty Company, the selling agent of the McCanless-Miller Realty Company, the owner of the apartments, approached in its office Miller, the vice-president of the McCanless Company, and advised him that Hansen for himself proposed a purchase of the apartments for $6500 cash, subject to mortgages for $43,000, upon a thirty-day verbal option, to all of which Miller agreed. Miller denied that he knew that Hansen was plaintiff's agent. Snyder then advised Miller that Hansen did not desire to sign the exchange contract, and informed him (Miller) that he had suggested to Hansen the name of Adams, Miller replying that Adams had been used by them to sign papers and hold titles.

The testimony of Snyder, in substance, corroborated that of Miller, but Snyder further testified that, on an occasion, he stated that Miller dictated the exchange contract between plaintiff and Adams, but that Miller dictated the terms of the mortgages and the legal numbers of the buildings, and that he meant that Miller gave the information to him or to the stenographer and that Hansen furnished information as to the Texas lands.

The substance of the testimony of Hansen was, on the other hand, that, at the time of the execution of the exchange between plaintiff and Adams, he presumed that Adams was the owner of the apartments and that it was a bona-fide transaction; that shortly subsequent to the expiration of thirty days from the date of the exchange contract, allowed for the inspection of the Texas properties, Hansen went to see Snyder, on his return from Colorado, who informed Hansen that he could not handle the deal, as he did not have the money. Thereupon Snyder suggested that Hansen handle the deal, as he (Snyder) could obtain for him the buildings cheap: He did not ask Snyder whether he was making the deal through Adams. Snyder replied that he would see Miller and it was then that Hansen first obtained the information that the McCanless-Miller Realty Company was the actual owner of the apartments. Without information to plaintiff, Hansen entered into a sales contract, dated September 9, 1922, with the Mc-Canless-Miller Realty Company to purchase from it the apartments for $5750 cash, subject to mortgages for $43,000. Thereafter, adopting the exchange contract between plaintiff and Adams, Hansen had the apartments conveyed to plaintiff at the instance of the McCanless Company, and acquired through straw persons the title and beneficial interest to plaintiff's Texas lands.

The record contains no evidence that any of the defendants, except Hansen, were interested in or received any direct profit by reason of Hansen's acquisition of plaintiff's Texas lands. The actuating lure to Miller and the McCanless Company was the sale of the apartments for $24,750, over and above the first mortgages aggregating $24,000, comprised of $5750 cash and notes for $19,000, secured by second mortgages. While the books of the McCanless Company tended to show that the construction cost of the buildings aggregated $44,000, yet substantial evidence on the part of plaintiff tended to show the construction cost was $27,000, and their market value $35,000 or $36,-000. It follows that the evidence tends to show that these defendants were to profit by reason of the purported conspiracy and fraud, notwithstanding they had no interest and did not participate in the actual profits of the Texas lands.

Notwithstanding Miller testified to the contrary, we think that sufficient facts and circumstances were in evidence to authorize the inference that Miller, as vice-president of the McCanless Company, prior to the execution of the exchange contract by Adams and plaintiff, knew that Hansen was plaintiff's agent relative to the disposition of the Texas lands. Such inference was justified by the facts that Miller knew that Hansen did not want to sign the exchange contract as a party thereto, but desired that Adams, a straw person, appear as the vendor of the apartments to plaintiff, in place and stead of Hansen. It was further justified by Snyder's testimony that Miller

dictated the exchange contract. By reason of these facts, Miller and the McCanless Company, for which he was acting, actuated by a desire to sell the apartments, came to an understanding with Snyder and Hansen, and concealed from plaintiff that Hansen was in fact the owner of the apartments and the party to the trade, which Miller knew, or ought to have known, was a breach of trust on Hansen's part, resulting that Miller and the McCanless Company were participants in conspiracy and fraud, thereby becoming responsible for such fraudulent statements as Snyder or Hansen made.

Moreover, we think that Hansen's testimony tends to show a conspiracy and fraud on the part of Miller and the McCanless Company. It is evident that Adams was a straw party in the transaction, and it may be inferred from Hansen's testimony that the McCanless Company, relative to the exchange contract, was originally the real party in interest therein. If it was, as Hansen's name appeared in the exchange contract as plaintiff's agent as to the Texas lands, that fact was known to both Miller and the McCanless Company, and they were charged with such knowledge, for Miller was handling the transaction. So, when subsequently the McCanless Company repudiated the deal with plaintiff and procured Hansen through Snyder to take it over, they participated in a breach of trust and a conspiracy, rendering them liable for any fraudulent statement made by Hansen or Snyder.

Furthermore, if the McCanless Company was the real party in interest to the exchange contract, Snyder was its agent or authorized sub-agent to its knowledge relative to the sale of the apartments. We think the representations made by Snyder were within the course and scope of his employment, resulting that the McCanless Company, his principal, was responsible therefor. [2 C. J. 616, 858; 9 C. J. 672; Judd v. Walker, 215 Mo. 312, 114 S. W. 979.] As was said in City Nat. Bank v. Dun, 51 Fed. 160, 1. c. 163, quoting from Barwick v. Bank, L. R. 2 Exch. 259, 12 E. R. C. 298, "The master is answerable for every such (fraudulent) wrong of his servant or agent as is committed in the course of his service and for the master's benefit, though no express command or privity of the master be proved." [Connecticut Mutual Life Ins. Co. v. Carson, 186 Mo. App. 221, 172 S. W. 69.] As it was within the course of the agent's employment to represent the number of acres in a tract of land, so as to render the principal liable (Judd v. Walker, 215 Mo. 312, 114 S. W. 979), so was it within the course of Snyder's employment, under this theory, to represent that the construction cost of the apartments was $79,000, and that the least they could be purchased for was $79,000 cash. In this situation, by their acts and concealment, they led plaintiff to believe that Adams was the real owner so as to induce him to believe to be true the representations as to the construction cost and

the purchase price. The defendants, except McCanless personally, according to the evidence, were cognizant of the breach of trust, thus ratifying the representations of Snyder and bringing into existence a conspiracy to defraud as though it had been planned prior to the execution of the exchange contract. A corporation may be liable for a conspiracy (12 C. J. 610). While the gist of a civil action for both conspiracy and fraud is damage, it is not necessary, we think, that any particular conspirator should have profited thereby, but that damage resulted to the plaintiff. [State v. Bresse, 33 S. W. (2d) 919; 12 C. J. 581.] As to Miller and the McCanless-Miller Realty Company, plaintiff made a submissible case.

IV. Defendant McCanless avers that the probative force of the evidence is insufficient to show that he participated in the conspiracy and fraud. Although surmises and conjectures arise from the evidence, we think his conclusion is correct. Neither conjecture nor surmise may be made the basis of an action for conspiracy and fraud. It is true that the apartments were erected under his direction, that he was a stockholder and president of the McCanless Company, and a stockholder and president of the Gregg Company; that the sale of the apartments to Hansen was submitted to him, as was practically every sale, and that no one had the right to dispose of the properties without consulting Miller and himself; but none of these matters, in our opinion, tended to show that McCanless knew or was charged with knowledge that Hansen was plaintiff's agent, or that he (McCanless) was a participant in the conspiracy and fraud. His act in giving consent to the sale to Hansen and in signing the deeds to the property was the act of the corporation, not his personal act. Nor do we think that McCanless personally may be charged with notice of a conspiracy or fraud merely because he was president of the corporation. To hold an officer of a corporation for acts done, it must be shown by evidence of probative force that he had actual or constructive knowledge of the actionable wrong and participated therein. [Ray County Savings Bank v. Hutton, 224 Mo. 42, 123 S. W. 47; Hoover v. Wise, 91 U. S. 308.] While the record fails to develop evidence that McCanless had knowledge or was a participant in the conspiracy and fraud, nevertheless as he is president and vitally interested in said corporations, and will probably desire to defend for them upon a retrial, we reverse the judgment and remand the cause as to him to afford plaintiff the opportunity, if able, to produce evidence tending to show him a participant therein.

V. In an action for fraud, the measure of damages is the difference between the actual value of the property at the time purchased

and the value or worth it would have had had the representations been true. [Busse v. White, 302 Mo. 672, 259 S. W. 458; Simpson v. Burnett, 299 Mo. 232, 252 S. W. 949; Kendrick v. Ryus, 225 Mo. 150, 123 S. W. 937.]

VI. In its Instruction C-1, the court charged the jury: "The jury, may, if they so desire, allow interest at the rate of six (6%) per cent on the amount, if any, found in favor of the plaintiff from August 5, 1922." In an action for fraud, where the demand can be ascertained by computation and when the time from which interest, if allowed, must run can be ascertained, the jury may be instructed that they may allow interest. [Arthur v. Wheeler & Wilson Mfg. Co., 12 Mo. App. 335; 27 C. J. 88.] In this case the demand was unliquidated and incapable of being ascertained by computation. A logical and well considered discussion of the question may be found in Laughlin v. Hopkinson, 292 Ill. 80, 126 N. E. 591, a case substantially in point. The court erred in instructing the jury to allow interest.

VII. All of the defendants complain of the refusal of the court to give to the jury some thirteen instructions offered by them. As the case was submitted on a theory other than fraud, we think it unnecessary to discuss or analyze them. It may be that some of the instructions should be given on a retrial, but those matters we leave to the trial court.

VIII. Defendants complain of the admission of certain testimony offered by plaintiff. The plaintiff was entitled to the benefit of his bargain, that is, the difference between the actual value of the apartments purchased at that time and the value they would have had had the representations been true. Consequently, the value of plaintiff's Texas lands was irrelevant and immaterial and not an issue in the case. Evidence thereof should have been rejected. [Busse v. White, 274 S. W. 1046.]

IX. We are unable to see that the admission of the articles of association of the corporation defendants, or that the delinquent personal tax statements of Miller, or evidence relating to the wealth of any defendant was justified. Where a number of defendants are sued jointly, their wealth, either individually or collectively, cannot be shown for the purpose of punitive damages, for one defendant cannot be punished because of the wealth of another. [Schafer v. Ostmann, 148 Mo. App. 644; 129 S. W. 63; Washington Gas Light Co. v. Lansden, 172 U. S. 534, 1. c. 553; Stansberry v. McDowell, 186 S. W. (Mo. App.) 757.]

X. Defendants further complain that the court erred in admitting testimony that the buildings were not well constructed, as well as the construction cost thereof, photographs, various provisions of the Kansas City building code and testimony as to the life of the buildings. This evidence was competent, relevant and material as to the actual market value of the buildings at the time of the execution of the exchange contract, for their market value, to some extent at least, was evaluated by the kind and condition of their construction.

XI. It is unnecessary to discuss defendants' complaints relative to the argument of plaintiff's counsel and the excessiveness of the verdict, as the same questions may not again arise.

The judgment is reversed and the cause remanded. *Cooley* and *Westhues, CC.*, concur.

PER CURIAM:—The foregoing opinion by Davis, C., is adopted as the opinion of the court. All of the judges concur.