**OMAHA INDEMNITY COMPANY, et al., Plaintiffs,**

v.

**ROYAL AMERICAN MANAGERS, INC., et al., Defendants.**

**No. 86–0422–CV–W–9.**

United States District Court, W.D. Missouri, W.D.

Oct. 2, 1991.

John C. Dods, Peter E. Strand, Joe Rebein, Shook, Hardy & Bacon, Kansas City, Mo., Sheila J. Carpenter, Francis M. Gregory, Jr., James H. Clinger, Sutherland, Asbill & Brennan, Washington, D.C., John W. Bonds, Jr., J.D. Fleming, Jr., Carey DeDeyn, Sutherland, Asbill & Brennan, Atlanta, Ga., for plaintiffs.

Byron N. Fox, Byron Neal Fox, P.C., Kansas City, Mo., for defendants Program Administration, Patrician Realty, Inc., Kensu Holdings, Inc., Fielding Reinsurance and William A. Schonacher.

Robert L. Wehrman, Polsinelli, White, Vardeman & Shalton, Kansas City, Mo., James M. Kaplan, Wilson, Elser, Msoskowitz, Edelman & Dicker, New York City, for defendant Ram Syndicate, Inc. and William Alexander Reinsurance Management, Inc.

Oscar B. Goodman, Goodman, Stein & Chesnoff, Las Vegas, Nev., for defendant James R. Wining.

John L. Hayob, Kevin E. Glynn, Niewald, Waldeck & Brown, Kansas City, Mo., for defendant World American Underwriters, Inc.

John L. Hayob, Kevin E. Glynn, Niewald, Waldeck & Brown, Robert W. Cotter, Dysart, Taylor, Penner, Lay & Lewandowski, P.C., Kansas City, Mo., for defendant Financial Guardian Group, Inc.

Thomas O. Baker, Baker & Sterchi, Kansas City, Mo., for defendant Administrative Management Services, Ltd., Inc.

Robert B. Best, Jr., Watson, Ess, Marshall & Enggas, pro se.

Steven Hurley Mustoe, McDowell, Rice & Smith, P.C., Kansas City, Mo., for garnishee the Merchants Bank.

Jonathan A. Margolies, McDowell, Rice & Smith, P.C., Robert L. Wehrman, Polsinelli, White, Vardeman & Shalton, Max W. Foust, Foust, Strother & Frickleton, Duke W. Ponick, Jr., Ponick, Amick, & Allen, Kansas City, Mo., for defendant Laramie Ins. Co.

Laramie Ins. Co., pro se.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT AGAINST DEFENDANT JAMES R. WINING

BARTLETT, District Judge.

### Findings of Fact

1) Omaha Indemnity Company ("Omaha Indemnity") is an insurance company incorporated under the laws of Wisconsin with its principal place of business in Omaha, Nebraska. Omaha Indemnity is a wholly owned subsidiary of Mutual of Omaha, an insurance company incorporated under the laws of Nebraska with its principal place of business in Omaha, Nebraska, and has historically functioned as a property and casualty insurer in the Mutual of Omaha group of companies.

2) World American Underwriters ("WAU") maintains its principal place of business in Kansas City, Missouri.

3) James R. Wining served as president and chief operating officer of WAU from 1981 to the end of 1983.

4) In early 1982, Omaha Indemnity was interested in entering into the reinsurance business in order to make an underwriting profit. Omaha Indemnity did not have the expertise to make reinsurance underwriting decisions. Therefore, consistent with industry practice, Omaha Indemnity sought to retain a managing general agent ("MGA") because an MGA could provide the expertise and experience that Omaha Indemnity lacked.

5) Omaha Indemnity and WAU entered into a managing general agent's agreement whereby beginning in mid–1982 WAU was to develop, accept and manage a portfolio of reinsurance and excess surplus lines insurance business in Omaha Indemnity's name and to provide quarterly reports accounting for the results of the business it accepted in this capacity as Omaha Indemnity's MGA. The agreement authorized WAU to "perform all the necessary ... underwriting ... functions" with respect to the reinsurance accepted by WAU in Omaha Indemnity's name.

6) Within WAU, Wining had the responsibility for underwriting and managing reinsurance business on behalf of Omaha Indemnity.

7) In entering into this management agreement with WAU, Omaha Indemnity relied upon WAU and Wining's representations about the specialized expertise of Wining in the underwriting and management of reinsurance and excess surplus lines insurance business.

8) Throughout the time that Wining was with WAU, Omaha Indemnity relied upon Wining's skill in making indemnity judgments. Omaha Indemnity did not look over Wining's shoulder, did not supervise him and did not re-evaluate the underwriting judgments he made in accepting reinsurance business. Also, Omaha Indemnity did not make independent underwriting decisions. Consistent with its desire to participate in a profitable book of reinsurance business, Omaha Indemnity analyzed the financial reports received from WAU.

9) WAU's quarterly reports over the 17–month period in which it accepted reinsurance business in Omaha Indemnity's name revealed no reason to be concerned about Wining's underwriting decisions. These reports showed approximately 6.8 million dollars in gross written premiums and $928,789 in underwriting profits.

10) Michael D. Vogel, Omaha Indemnity's vice-president, was in charge of monitoring Omaha Indemnity's participation in the agreement with WAU. Vogel did not have reinsurance underwriting experience although he had some familiarity with reinsurance underwriting concepts. Vogel relied on Wining's expertise in reinsurance underwriting.

11) Reinsurance underwriting requires the exercise of specialized knowledge and skill. In the reinsurance industry, underwriters are expected to have and use their learning and skill to accept only business that has a reasonable probability of resulting in an underwriting profit.

12) The steps that a reinsurance underwriter should take in making underwriting decisions depend on whether the business presented for acceptance is facultative or treaty.

13) Facultative reinsurance is reinsurance that covers all or part of a specific policy of insurance issued by the ceding company to a policyholder. The reinsurer has the "faculty" to accept or reject the proffered risk. In treaty reinsurance, the reinsurer agrees in advance to accept the proportional or non-proportional share of all defined risks insured or to be insured by the ceding company. A treaty under which the reinsurer agrees to accept a percentage share of the risks covered by all policies of the defined type is called a "quota share treaty."

14) In the case of treaty business that is submitted for acceptance, an ordinarily careful and skillful reinsurance underwriter in every case must consider investigating the historical record of profit or loss of the business, the underwriting procedures of the ceding company, the ceding company's claims and rate-making practices, its financial condition and the background of its management. Whether the exercise of ordinary care and skill requires affirmative investigation or audit of any one or more of these factors and the depth of the examination required depends upon the exposure to loss presented by the business submitted for acceptance. For ease of reference, I will call the consideration and investigation of these factors "pre-acceptance procedures."

15) Exposure to loss from acceptance of treaty business depends in large part upon a) the expected premium volume, which reflects the potential size of the loss if the business is not properly screened; b) whether the business covered by the treaty is a "difficult class" of business, that is, whether that class of business has frequently caused insurance companies to suffer large losses; and c) whether the submission is for a large percentage quota share in which case the ceding company's stake in the profitability of the business is less thus increasing the likelihood that the ceding company will be less careful in following appropriate underwriting guidelines.

16) A large premium volume from a high percentage share of a difficult class of business presents a very high exposure to loss. Under such circumstances, an ordinarily careful and skilled reinsurance underwriter will follow the pre-acceptance procedures described above—that is, the reinsurance underwriter must audit or independently verify the loss history of the business and the ceding company's underwriting, rate-making and claims practices and confirm the soundness of its financial condition and the competence and integrity of its management prior to determining whether to accept the business.

17) A reasonably careful reinsurance underwriter must, after accepting treaty business, monitor the business accepted to see if the results conform to the underwriter's prediction, and if the prediction is not met, to implement corrective action. In the case of business involving high exposure to loss, especially when the ceding company has little or no stake in the profitability of the business, a careful underwriter should require periodic audits of the ceding company's underwriting, reporting and claims practices and procedures.

18) An ordinarily careful and skilled underwriter's consideration of pre-acceptance procedures and post-acceptance monitoring should be documented in the underwriter's files.

19) Plaintiffs in this action presented the testimony of an expert reinsurance underwriter, William J. Gilmartin. Gilmartin's qualifications include a B.S. degree with a major in insurance from the Wharton School of Finance and Commerce at the University of Pennsylvania, 35 years of active involvement in reinsurance underwriting and extensive service as a reinsurance consultant, arbitrator and umpire. Gilmartin's testimony was knowledgeable, direct, clear, fair and credible.

20) Gilmartin presented detailed evidence concerning the underwriting of ten reinsurance treaties which accounted for over 90 percent of all the premiums written by WAU in Omaha Indemnity's name and over 90 percent of all the net losses experienced on all reinsurance business written by WAU.

21) In each of the ten treaties, a combination of premium volume, share of risk and difficulty of business combined to present a high degree of exposure to underwriting loss. In every case, there was a failure to perform the pre-acceptance procedures that a reasonably careful and skilled reinsurance underwriter should have utilized under such circumstances. In every case, the underwriting information was insufficient to support a reasonable anticipation of an underwriting profit. In many cases, the information showed instead the probability of an underwriting loss. In none of these ten cases was there the type of monitoring and corrective action necessary in large quota share acceptances.

22) With the exception of three files, all the remaining files shown in plaintiffs' Exhibit 30 show the same failure to follow the pre-acceptance procedures and post-acceptance monitoring that a reasonably careful reinsurance underwriter should have followed.

23) As a direct result of WAU and Wining's failure to perform appropriate pre-acceptance procedures and to perform appropriate post-acceptance monitoring and corrective actions on these ten treaties, Omaha Indemnity suffered the following losses:

a) $200,300,000 in underwriting losses;

b) $37,000,000 in lost investment income that would have been realized by Omaha Indemnity on funds it expended to satisfy losses on the portion of the business written by WAU that was not presented to the arbitration panel in *Omaha Indemnity v. RAM;*

c) $10,000,000 in costs of mitigating damages;

totaling $247,300,000.

24) From the total should be deducted the following amounts:

a) $30,600,000 recovered from third parties who are joint tortfeasors;

b) $84,400,000 already awarded by the arbitration award in *Omaha Indemnity v. RAM;*

totaling $115,000,000.

25) Therefore, the net damages directly suffered by Omaha Indemnity are $132,300,000.

### Conclusions of Law

1) WAU and Wining failed to exercise the reasonable care that a professional, experienced reinsurance underwriter would exercise under the same or similar circumstances in carrying out the responsibilities assumed by WAU under the MGA agreement between WAU and Omaha Indemnity. Specifically, although Omaha Indemnity entrusted WAU with the authority to obligate it to substantial reinsurance risks based on representations about Wining's expertise in reinsurance underwriting, both WAU and Wining failed to give Omaha Indemnity the benefit of that level of knowledge and experience. Furthermore, WAU and Wining failed to give Omaha Indemnity the benefit of that level of knowledge and experience ordinarily required of a professional, experienced reinsurance underwriter in assessing and monitoring reinsurance risks.

■ 2) Under Missouri law, a corporate official cannot shield himself from liability merely because he is a corporate officer. A corporate officer may be liable to a third party for damages caused by his wrongful actions if he had actual or constructive knowledge of the actionable wrong and participated therein. *Boyd v. Wimes,* 664 S.W.2d 596, 598 (Mo.App.1984); *Osterberger v. Hites Constr. Co.,* 599 S.W.2d 221, 229 (Mo.App.1980); *Wolfersberger v. Miller,* 327 Mo. 1150, 39 S.W.2d 758, 763-64 (1931).

■ 3) Based on all the evidence presented and reasonable inferences drawn therefrom: a) Wining had actual knowledge of WAU's failure to perform proper pre-acceptance procedures and post-acceptance monitoring and corrective procedures; and b) Wining participated in, directed and supervised the inadequate procedures.

■ 4) A fiduciary relationship existed between WAU, on one hand, and Omaha Indemnity, on the other, arising out of Omaha Indemnity's entrusting WAU and Wining with accepting significant reinsurance risks in Omaha Indemnity's name and Omaha Indemnity's reliance on Wining to exercise the knowledge and skill in reinsurance underwriting that WAU and Wining represented it had. *McKeehan v. Wittels,* 508 S.W.2d 277, 280 (Mo.App.1974). As a result of this fiduciary relationship, WAU and Wining owed Omaha Indemnity the duty to exercise reasonable care and skill in accepting underwriting risks in Omaha Indemnity's name and monitoring that business.

5) Wining could reasonably anticipate that Omaha Indemnity would be harmed as a likely result of his failure to exercise due care in performing the responsibilities WAU had undertaken under the MGA.

■ 6) Under Missouri law, Wining is responsible for economic damage directly and proximately caused by WAU and his failure to render due care in performing the responsibilities to Omaha Indemnity under the MGA.

7) As a direct and proximate result of WAU's failure to exercise due care in evaluating the underwriting risks and in assessing the probability of underwriting profit and in adequately monitoring the underwriting risks assumed on behalf of Omaha Indemnity to guard against loss, for all of which Wining is responsible, Omaha Indemnity suffered net damages in the amount of $132,300,000.

### Order

For the reasons stated, it is ORDERED that judgment is entered in favor of plaintiffs and against defendant James R. Wining in the amount of $132,300,000, together with interest from the date of this order at the rate of 5.57% per annum, and plaintiffs' costs incurred herein.