UNITED STATES, for Use and Benefit of
LICHTER et al. v. HENKE CONST.
CO. et al.

HENKE CONST. CO. et al. v. UNITED
STATES, for Use and Benefit of
LICHTER et al.

Nos. 13150, 13151.

Circuit Court of Appeals, Eighth Circuit.

July 18, 1946.

Frank C. Mann, of Springfield, Mo. (Mann & Mann, of Springfield, Mo., on the brief), for United States ex rel. Jacob Lichter et al.

Arthur M. Curtis, of Springfield, Mo., and Charles E. Cessna, Jr., of Chicago, Ill. (Farrington & Curtis, of Springfield, Mo., on the brief), for Henke Const. Co., et al.

Before SANBORN, WOODROUGH, and RIDDICK, Circuit Judges.

WOODROUGH, Circuit Judge.

These appeals are to review a judgment which determines controversies between the government's general contractor (a corporation) for the construction of additions to the United States Medical Center at Springfield, Missouri, and its subcontractor for the brick and tile work (persons doing business as a co-partnership). See 67 F.Supp. 123. The action was brought under the Miller Act, 40 U.S.C.A. §§ 270a, 270b, and 270c, in the name of the United States for the use of the subcontractor against the general contractor and its bondsman to recover unpaid balance of $14,639 due on the subcontract, plus $34,340.32 for "additional work and labor performed and materials furnished." The general contractor counter-claimed for liquidated damages for delay at the rate specified in the subcontract in an amount in excess of the unpaid balance of the subcontract price. The trial was to the court without a jury and the judgment awarded recovery to the subcontractor for the unpaid balance of the subcontract price amounting to $14,639, plus items of authorized extras aggregating $4,549.14, plus interest at 6% from the date the sums became due. It denied the general contractor recovery for damages for the subcontractor's delay. The subcontractor appeals (No. 13,150) from so much of the judgment as disallows five specific items it sued for. The general contractor appeals (No. 13,151) from that part of the judgment which allows interest on the said amounts found to be due the subcontractor and from that part which denies recovery for damages for delay. The members of the subcontractor co-partnership may be referred to as plaintiffs, and the general contractor as defendant.

*The Subcontractor's Appeal.*

Though five disallowed items are involved in the subcontractor's appeal,[1] we will pass upon the substantial contentions relative to all of them in discussion of what was called throughout the proceedings (1) the "brick controversy" and (2) the "tile controversy."

*The Brick Controversy.*

Prior to the execution of the subcontract defendant had entered into contracts with the Lusco Brick & Stone Company for the purchase of all common and face brick, Utica bricklayer's cement for use in laying the brick, and salt glazed tile and partition tile required to be installed in the buildings. Plaintiffs orally agreed that if they received the subcontract to do the brick and tile work they would assume defendant's prior purchase agreement with Lusco Brick & Stone Company and plaintiffs knew the details of that agreement.

Plaintiffs' position regarding the brick controversy is that they were damaged in the sum of $19,158.07 as a result of addi-

---

[1] "Jacob Lichter and Jennie L. Lichter, partners doing business under the firm name of Southern Fireproofing Company, a partnership, plaintiffs above named, appeal to the Circuit Court of Appeals for the Eighth Circuit from so much of the judgment entered in this action on January 9, 1945, as disallows:

"Approximately $823.87 under Item 2 of Plaintiffs' Bill of Particulars and representing its overhead expense and profit growing out of the substitution of ceramic tile in the place of salt-glaze tile;

"The sum of approximately $21.24, representing plaintiffs' overhead expense and profit on the cutting of bullnose caps in Unit D under Item 3 of Plaintiffs' Bill of Particulars;

"The sum of $255.76 of plaintiffs' claim under Item 4 of their Bill of Particulars;

"The sum of $15,098.99 of plaintiffs' claim under Item 5 of their Bill of Particulars;

"The sum of $3,127.49 of plaintiffs' claim under Item 6 of their Bill of Particulars."

tional labor and material required in connection with the furnishing and installing of the brick work, because defendant required plaintiffs to install brick furnished by Lusco although the brick varied in size from the standard size brick as established by simplified practice, and in refusing to permit plaintiffs to make reasonable and necessary adjustments in the brick coursing and manner of laying the bricks, as allegedly permitted by the specifications, and by reason of the fact that the concrete work against which the brick wall was constructed was negligently and improperly installed.

The pertinent provisions of the specifications of the government relating to size of brick and coursings are set forth in plaintiffs' exhibit No. 5 and provide as follows:

"14—2. Unless otherwise specified or definitely shown by the drawings, details and dimensions of brick work given on the drawings are based on the use of standard size brick as established by simplified practice, to wit, 2¼ by 3¾ by 8 inches.

"14—3. Common brick that are acceptable for quality but that vary slightly from the specified limitations for size in one or more dimensions may be used provided the contractor makes, and assumes responsibility for, all necessary adjustments in the work affected by such change to the Procurement Division, Public Buildings Branch.

"14—4. All exterior brick facing shall be of select common brick, to match present brick facing of Administration Building No. 1.

"14—5. Sizes of brick not otherwise indicated shall be the approximate dimensions given in Simplified Practice Recommendation No. 7 issued by the U. S. Department of Commerce with permissible variations between bricks of not more than ⅛ inch in breadth or depth nor more than ¼ inch in length for rough-face brick, and not more than ⅟₁₆ inch in breadth or depth nor more than ⅛ inch in length for smooth-face brick.

"14—6. Where select common brick are required for exterior brick facing, they shall be Class H, and shall be selected for uniformity of shape and size. They shall be furnished in the required range of nat-ural colors obtained by burning and shall be laid with the best face exposed.

\* \* \* \* \*

"14—18. Dimensions. Figured thickness of walls are based on standard size units. For spacing of facing brick courses and for jointing of pattern work on special details, see drawings. Courses of common brick work shall be so spaced as to level off flush with the face work at all bonding courses and at joints with metal ties. Joints in common brick work shall not exceed ⅝ inch in width.

"14—19. If units of other than standard sizes are used, there shall be no change in story heights, in outside dimensions of outer walls nor in the location of center lines of interior walls or partitions, and all connecting work shall be properly adjusted to any other variations due to the use of such units."

A notation on the government drawings provided: "The following materials are to match in all respects like materials in present building No. 1, except as noted below:

"Brick: Brick joints to be slightly concave. \* \* \*"

Select common brick known as smooth-face brick, was used as a face brick and, as noted, the specifications provided that the variation in thickness of the brick used should not exceed ⅟₁₆ of an inch. The government drawings prepared for use in the construction showed a brick and mortar coursing of 2⅝ inches (referred to by witnesses as four courses to 10½ inches), and it is clear that the specifications and drawings contemplated that the brick should average 2¼ inches in thickness with ⅜ inch mortar joints. Plaintiffs' complaint in regard to use of oversize brick without allowing a change in courses was based on the increased cost incident to laying brick with mortar joints of less than ⅜ inch thickness.

The first carload of brick for exterior brick facing was delivered early in March 1939, and was rejected by the government construction engineer on the ground that the shipment contained an excessive amount of broken and warped brick and had not been selected for uniformity of shape. On March 11, 1939, plaintiffs wrote

to defendant complaining that the bricks received were oversize and lacked uniformity, suggesting that other brick be obtained, and asking defendant to cancel the Lusco contract. On March 15, 1939, representatives of plaintiffs, defendant and Lusco met at the job site to discuss the brick situation. Lusco's representative stated at the outset of the conference that he doubted that Lusco could furnish bricks nearer a 2¼-inch average thickness than that previously shipped, but later stated that he would make a special effort to furnish brick averaging 2¼-inch thickness; and on the day of the conference two cars of brick were ordered by defendant's representative.

Following the conference of March 15th, Mr. Means, plaintiffs' representative, conferred with Mr. Henke in Chicago and submitted samples of another brick, but the latter declined to submit the samples to the government. On March 17, Means wrote defendant reviewing the situation and urging substitution of another brick. In reply defendant stated that no alternate brick would be submitted and that defendant considered that matters of substance complained of by plaintiffs had been overcome. Further correspondence between the parties followed, and on March 27, 1939, another conference was held at the job site. At this conference brick that had arrived pursuant to the March 15 order was measured and found to run generally 2¼ inches thick. On learning this plaintiffs agreed to continue the work if Lusco should continue to send bricks of proper size, but made it clear that in agreeing to use the Lusco brick plaintiffs waived no rights under the specifications.

About this time plaintiffs began to insist emphatically on a contention previously made, that under the specifications a change in coursing was permissible if brick varying from standard size was used. At plaintiffs' request defendant sent telegrams and letters to the government seeking adjustment of the coursing, but the Procurement office insisted that the coursing called for in the specifications be followed, and plaintiffs proceeded with the work under protest.

There is a dispute in the evidence concerning whether brick delivered after March 27 was within the thickness required by the specifications. Plaintiffs' evidence tended to establish that a large percentage was over 2¼ inches thick and that the brick would average 2⁵⁄₁₆ inches thick, while defendant's evidence tended to establish that the brick was not oversize. One W. W. Johnson, a Springfield, Missouri, contractor testified that at defendant's request he inspected the buildings and measured the brick in walls where he could reach them from the ground and found that the brick ran consistently 2¼ inches thick and that he found no variation of more than ¹⁄₁₆ inch.

The District court, 67 F.Supp. 123, found that some brick furnished by Lusco exceeded 2⁵⁄₁₆ inches in thickness but that most of it did not, that most of it averaged 2¼ inches thick, that laying of oversize brick took only a very small amount of extra time and labor, if any, and that there appeared in evidence no accurate estimate of any additional time and labor required by use of the few oversize bricks and no means shown by which they might be calculated. In its memorandum opinion, the District court stated: "When the question [regarding thickness of brick] was presented, careful inspections and tests were made of the bricks shipped, and it appeared conclusively, with negligible exceptions, that the brick agreed to be furnished by Lusco Brick & Stone Company conformed to its contract and that the plaintiffs were not put to extra expense for material or labor by reason of using oversize brick."

█ The District court's findings are amply supported and, therefore, conclusive. Federal Rules of Civil Procedure, rule 52(a), 28 U.S.C.A. following section 723c; Sandlin v. Johnson, 8 Cir., 152 F.2d 8. It will be noted that although the government insisted that brick used should not exceed 2⁵⁄₁₆ inches in thickness, and rejected the brick delivered early in March, the brick which was used in the walls and which plaintiffs contend was oversize was accepted by the government. There is the further circumstance of plaintiffs' failure to complain of oversize brick after the

March 27 conference until the brick work was completed.

▮ In view of the above findings we overrule plaintiffs' contention that defendant is liable for damages because plaintiffs were denied the right to cancel the Lusco contract for brick and to submit to the government for approval samples of brick of another manufacturer. If Lusco furnished brick which satisfied the specifications, plaintiffs had no right to demand the use of other brick. The fact that there may have been a few oversize bricks did not authorize the cancellation of the Lusco contract and presentation of brick of another company for approval of the government which apparently was satisfied with that furnished by Lusco.

▮ Plaintiffs insist that under the specifications, they had the right to change the brick courses, and that defendant is liable for additional expense caused by its refusal to permit the change, regardless of whether the proposed change was authorized by the government. The subcontract, however, was subject to the provisions of the original construction contract, and under that contract the government had the right to approve or disapprove the work. Defendant had no independent right to authorize any change in courses, it being solely for the government to decide whether to permit a change. It is quite clear that the government would not have approved the work if a change in courses had been made, not only without its consent but directly in the face of its expressed refusal to permit a change.

▮ Plaintiffs contend that the interpretation of the specifications regarding the right to establish a brick and mortar coursing other than four courses to 10½ inches was a question of law for the court, and that the construction placed on the specifications by the government was not binding on plaintiffs under article 15 of the original contract, which provides:

"Article 15. Disputes.—Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed."

Article 3—22 of the specifications provides:

"3—22. Interpretations.—The decision of the contracting officer or his authorized representative as to the proper interpretations of the drawings and specifications shall be final. The Assistant Director of Procurement, Public Buildings Branch, is the duly authorized representative of the Contracting Officer."

We are convinced that a determination of requirements of the specifications regarding brick and mortar courses was in the first instance a question for the contracting officer, subject to review for fraud or unfairness, Merrill-Ruckgaber Co. v. United States, 241 U.S. 387, 36 S.Ct. 662, 60 L.Ed. 1058; School Dist. of Independence v. Wilcox, Mo.App., 58 S.W.2d 1009, and furthermore, that the decision was clearly sound. It is plaintiffs' position that under Paragraph 14–4 of the specifications and the notation on the drawings providing that facing brick should be of select common brick to "match" the brick facing of the Administration building, which plaintiffs point out had a horizontal mortar joint of approximately ½ inch, the plaintiffs had the right to change the coursing to match that of the Administration building. The Acting Assistant Director of Procurement decided that Paragraph 14–4 referred merely to the kind of brick desired and could not be construed to indicate quality of workmanship required. This seems to be a reasonable construction of Paragraph 14–4 in view of the coursing requirements of the government drawings and Paragraph 14–5 of the specifications.

The plaintiffs claimed damages for extra work occasioned by the alleged fact that the concrete water table which was constructed by defendant and on which the first course of brick was laid, was irregular and wavy, which interfered with the laying of the brick, and that concrete walls

and ceilings were improperly constructed by defendant, being out of plumb, irregular and wavy. The District court found that although the water tables on each of the units constructed were wavy in places and there were some slight variations, these were no more than would be expected by members of the trade in this type of construction work except in one place in the unit known as unit "C," where it was ½ inch higher than called for; that except for one place in unit "A" the walls did not vary from plumb more than might customarily be expected; and that in this regard plaintiffs were put to extra cost for labor and material in the sum of $144.88.

■ We conclude that the District court's findings in regard to the concrete surfaces are not clearly erroneous and are conclusive under rule 52(a). There was conflicting evidence on the issue but it is not for us to resolve the conflict. Masons employed on the job testified that although the concrete construction was slightly irregular in places, this was known to the trade as a "job condition." Defendant's evidence tended to establish that there were no serious imperfections other than in two small areas in the concrete walls which required the masons to cut the brick, and in the one area where the water table was high.

The District court denied recovery for the $144.88 extra cost for material and labor found to result from the wall being out of plumb on the ground that there was no written agreement to pay for the extra labor and material involved. The court also found that any additional labor and materials which might have been required in furnishing and installing brick work was not agreed to in writing before the work was done "as was required in the contract between plaintiffs and defendant Henke Construction Company," and concluded that plaintiffs were not entitled to recover on claims that were not founded on a written agreement to pay because such claims were not authorized under the contract.

The subcontract provided:

"No extra work or changes under this contract will be recognized or paid for, unless agreed to in writing before the work is done or the changes made; in which event the change shall be specified in detail as to extra work or changes desired, the price to be paid or the amount to be deducted should said change decrease the amount to be paid hereunder."

■ Plaintiffs contend that the work performed was not "extra work" within the above provision of the subcontract. We shall discuss this point with special reference to the $144.88 in view of the District court's findings against plaintiffs on the facts as to other items. We conclude that plaintiffs on discovering defective workmanship of defendant should have refused to proceed with the work until the condition was remedied by defendant, or should have obtained a written agreement by defendant to compensate plaintiffs for any additional work required. City of Salisbury v. Lynch-McDonald Const. Co., Mo. App., 261 S.W. 356; Orpheum Theater & Realty Co. v. Kansas City Casualty Co., Mo.Sup., 239 S.W. 841.

■ Dance v. Board of Education, 296 Ky. 67, 176 S.W.2d 90, though distinguishable on the facts, may lend some support to plaintiffs' contention that we should recognize a difference between extra and additional work and that the work performed here was not "extra work" within the applicable provision of the subcontract, but we think it is clear that the District court reached a permissible conclusion under Missouri law, which the plaintiffs themselves insist is controlling in this case. As stated in Russell v. Turner, 8 Cir., 148 F.2d 562, at page 564, "All that this court reasonably can be expected to do in reviewing cases governed by state law is to see that the determination of the trial court is not induced by a clear misconception or misapplication of the law."

■ Plaintiffs contend that if the subcontract provision relating to extras or changes was applicable, compliance with the provision was waived. In support of this contention they cite Lord Const. Co. v. United States, to Use of W. E. Sexton Co., 3 Cir., 28 F.2d 340. Our attention is called to numerous letters and telegrams relating to both brick and tile controversies

but in none can we find any agreement by defendant to pay extra for items other than those for which recovery was allowed, and under the Lord Const. Co. case a definite agreement to pay is required to establish a waiver.

*The Tile Controversy.*

Under the specifications, the interior walls of certain buildings and toilet and shower rooms in others were to be surfaced with salt glazed tile, but the government subsequently directed that ceramic glazed tile, a more expensive type, be substituted for salt glazed tile in certain places. Defendant protested that furnishing of ceramic glazed tile was not a contract requirement but wrote plaintiffs in regard to the matter, stating, in part,

"In order not to delay the progress of the work, it has been necessary for us to proceed with this matter under protest and we will expect your cooperation in giving us your help in order to substantiate our claim that the furnishing of these ceramic glazed wall units is not a contract requirement.

"However, in accordance with our conversation and agreement with you, we hereby confirm the fact that we will pay you the additional difference in cost between the salt glazed wall units, which is the basis of your contract, and the ceramic glazed wall units as above-mentioned. The extent of this extra will be computed at the time same can be definitely determined."

Plaintiffs contend that they are entitled not only to the difference in manufacturers' price to them between the two types of the tile but also to a sum representing 10% of such difference in price as overhead and 10% as profit. There is no claim that extra or additional work was required in installing ceramic glazed rather than salt glazed tile. We agree with the District Court that plaintiffs are entitled to recover only the additional cost of the ceramic tile, not augmented by 10% overhead and 10% profit. Such is a reasonable construction of the letter. Clearly the change from salt glazed tile to ceramic glazed tile was a "change" within the subcontract provision relating to payment for extra work or changes, and we are unable to spell out an agreement by defendant to pay for other than the additional cost to plaintiffs. This conclusion is not altered by the custom referred to in Gordon Form Lathe Co. v. Ford Motor Co., 6 Cir., 133 F.2d 487, a patent infringement case, to recognize overhead as financial outlay expended in production of an article. We do not deem the letter guaranteeing payment of the additional cost to be ambiguous nor to require construction against the writer.

The plaintiffs claim an amount representing additional labor and material required in connection with installation of glazed tile by reason of refusal of the government and defendant to consider, approve or act upon certain shop drawings of special glazed tile prepared and submitted by plaintiffs for approval.

The specifications provided that the contractor should furnish shop drawings required by the specifications, that no shop drawings should be submitted except as required by specifications or called for by the contracting officer, and that shop drawings submitted without being required would be returned without action. Shop drawings were required in numerous instances but the specifications contained no provision for shop drawings regarding the tile work. Agents of the Stark Brick Company, which furnished the tile used, sent shop drawings to plaintiffs who made corrections and forwarded them to defendant. They were submitted by defendant to the government and were returned without action with the following notation: "Shop drawings are not required for this work; however contract requirements should be followed in all cases."

The architectural plans called for wall tile units 5″ by 8″ in size with "a standard bullnose cap at ceiling." The District court found that "bullnose" is a general term applied to a number of different types of special ceramic glazed tile, refers only to shape of tile, and may be used to refer to various similar shapes of different sizes. In the shop drawings as corrected and submitted, plaintiffs proposed to use in the first floors of the various units a type of cap known as S–40–M and to use a D–40 type on the second floors. Subsequently and

after unsuccessful attempts to obtain approval of the shop drawings plaintiffs ordered for the first floors the S–40–M type of caps which plaintiffs believed to be "bullnose" caps.

When plaintiffs started to lay the caps in first floor shower rooms they were stopped by the government construction engineer who insisted on the use of D–40 type caps in both first and second floors. Defendant succeeded in obtaining permission from the engineer for plaintiffs to use S–40–M caps in first floor shower rooms and on August 3, 1939, wrote plaintiffs as follows: "You are hereby directed to proceed immediately with the installation of the block type caps [S–40–M type] which you have delivered to the job for use in the salt glazed wall units at shower rooms, and as rejected by the construction engineer's letter of Aug. 1." Plaintiffs interpreted this letter of August 3 as authority to use S–40–M caps, designed their coursings to that end and proceeded with the work.

A series of letters between plaintiffs and defendant followed in which defendant insisted that plaintiffs use D–40 type caps in all but shower rooms and plaintiffs contended they had the right to use S–40–M caps throughout the first floors. The government's construction engineer repeatedly protested the general use of S–40–M caps and finally the supervising engineer at Washington ruled that S–40–M caps could not be used.

The fallacy of plaintiffs' contention regarding shop drawings lies in their assumption that the damages they sustained resulted from failure of the government or defendant to approve or disapprove the shop drawings submitted. When the drawings were returned plaintiffs were warned that the contract requirements should be followed. The record is clear that at the time plaintiffs submitted the shop drawings and at all times thereafter they were aware that defendant had construed the contract as requiring a D–40 type cap and that the government was insisting on the use of such a cap.

Plaintiffs do not contend that the D–40 type cap did not satisfy contract requirements but insist that S–40–M type likewise satisfied the requirements and failure either to approve or disapprove the latter caused damage to plaintiffs. But plaintiffs had independent knowledge that use of the D–40 type caps was required. On June 8, 1939, before the caps were ordered, plaintiffs wrote defendant making inquiry as to type of cap required and received a letter dated June 13, 1939, stating that a cap of the D–40 series was to be used, and enclosing a sketch of this type cap. While plaintiffs insist that they had no confidence in the ability of the author of the June 13 letter to determine the type of cap required, they cannot dispute the important fact of knowledge, and, furthermore, in subsequent correspondence with defendant plaintiffs were fully informed that the D–40 type cap was required.

In view of the above facts, and the further fact that the shop drawings originally submitted to plaintiffs, and before they were corrected by them, provided for general use of a D–40 type cap, we cannot say that failure to approve or disapprove the shop drawings misled plaintiffs. Furthermore, the specifications did not require shop drawings, and when the government returned those submitted with the notation attached, it was not for defendant to assume to approve them.

Plaintiffs contend that the letter of August 3, 1939, gave them authority to install S–40–M type ceiling caps generally throughout the first floors but the District court held otherwise. The letter is ambiguous and plaintiffs' proffered construction of the letter might carry more weight were it not for the circumstances under which it was received. The District court found that early in July plaintiffs knew that the government objected to the use of this type of cap. Plaintiffs also had knowledge that defendant insisted on general use of D–40 caps. Notwithstanding this knowledge, plaintiffs ordered the caps and started to use them in shower rooms. The reasonable construction to be given the August 3rd letter was that defendant had interceded on behalf of plaintiffs in order to permit them to proceed with the work started in the shower rooms, using the

S–40–M caps for that purpose. Plaintiffs were not justified in construing the letter to suit their purposes, and fortified only with their own construction, in proceeding to design their coursings and proceed with the work without further inquiry. In passing we note that the letter of August 3rd on which plaintiffs rely, was written by the same person who wrote the letter of June 13, and in whom plaintiffs insist they had no confidence.

█ Plaintiffs sought recovery of additional costs for cutting cap tile in one of the units because the ceiling was too low. The District court entered judgment for plaintiffs for the amount of actual costs but disallowed their claim for overhead and profit. We need add but little to what was said regarding the claim for overhead and profit in connection with the change from salt glazed tile to ceramic. The written agreement of defendant to pay this claim is found in a letter from defendant to plaintiffs, the pertinent paragraphs of which follow:

"Chicago
"September 27, 1939
"The Southern Fireproofing Co.
"1304 Chamber of Commerce Bldg.
"Cincinnati, Ohio
"Gentlemen:

"Reference is made to your letter of September 25th regarding the above-mentioned project in which you state: 'We wish to advise that we find the ceilings in Unit D, second floor to be 1 inch lower than called for in contract plans. This affects our glazed tile work, making it impossible to put it in accordance with contract details.'

"Our representative, Mr. Asher, reviewed this matter with your Mr. Newman yesterday and reports that this condition is not a matter of the ceiling being one inch low, but that the cell door frames were set too high in this unit which is the work of our sub-contractor, the C. W. Olson Mfg. Co.

"In view of the fact that the expense of this cutting must necessarily be charged back to this Contractor, we ask that you review the cost of doing this and submit to us your proposal having in mind that your fellow sub-contractor is involved when putting in a price on same. * * *"

Clearly the letter contemplated payment only of additional cost to plaintiffs and cannot be construed as authority for a claim for overhead and profit.

*The Cross Appeal.*

Defendant's cross appeal involves the propriety of the District court's allowance of 6% interest on the amount found to be due to plaintiffs, from December 1, 1940, which was shortly after demand for payment was made by plaintiffs, and of the court's denial of recovery on defendant's counterclaim for damages allegedly caused by plaintiffs' delay in completing their work.

In the District court the defendant contended that Illinois law determined its liability for and rate of interest, because the subcontract was executed in that state. The construction work was to be performed by plaintiffs in Missouri, but there was no provision in the subcontract regarding place of payment of amounts due to plaintiffs under the subcontract. On appeal defendant contends that under the circumstances it was defendant's duty to make the payments in Illinois and for that reason Illinois law governs liability for interest and rate thereof. However, payment was actually received in each instance by plaintiffs at their home office in Ohio. The law of Ohio was not relied upon by either party at the trial. The District court, sitting in Missouri, determined that Missouri law was applicable and allowed interest at the Missouri rate of 6% rather than the Illinois 5% rate.

█ That a federal court in a diversity of citizenship case must follow conflict of law rules prevailing in the state in which it sits was settled in the recent case of Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477. In the Klaxon case the Supreme Court said:

"We are of opinion that the prohibition declared in Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A. L.R. 1487, against such independent determinations by the federal courts extends to

the field of conflict of laws. The conflict of laws rules to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts. Otherwise the accident of diversity of citizenship would constantly disturb equal administration of justice in coordinate state and federal courts sitting side by side. See Erie R. Co. v. Tompkins, supra, 304 U.S. at 74–77, 58 S.Ct. at 820–822, 82 L.Ed. 1188, 114 A.L.R. 1487. Any other ruling would do violence to the principle of uniformity within a state, upon which the Tompkins decision is based. Whatever lack of uniformity this may produce between federal courts in different states is attributable to our federal system, which leaves to a state, within the limits permitted by the Constitution, the right to pursue local policies diverging from those of its neighbors. It is not for the federal courts to thwart such local policies by enforcing an independent 'general law' of conflict of laws. Subject only to review of this Court on any federal question that may arise, Delaware is free to determine whether a given matter is to be governed by the law of the forum or some other law. Cf. Milwaukee County v. M. E. White Co., 296 U.S. 268, 272, 56 S.Ct. 229, 231, 80 L.Ed. 220. This Court's views are not the decisive factor in determining the applicable conflicts rule. Cf. Funkhouser v. J. B. Preston Co., 290 U.S. 163, 54 S.Ct. 134, 78 L.Ed. 243. And the proper function of the Delaware federal court is to ascertain what the state law is, not what it ought to be."

While the present action is brought under a federal statute, it is in the nature of an action on contract and the construction of the federal statute is not involved. We think the doctrine of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, as extended and applied in the Klaxon case, is applicable here. Cf. United States ex rel. Gillioz v. John Kerns Const. Co., D.C.Ark., 50 F. Supp. 692, and cases cited.

 Under Carson v. Smith, 133 Mo. 606, 34 S.W. 855, the right to and rate of interest when allowed as damages and not under contract are determined by the law of the forum. The District court held that the contract was to be performed in Missouri and that the parties contemplated that Missouri law would apply. The payment checks were of course prepared in Illinois and defendant's administrative work was necessarily done there, but it is clear that no substantial part of the contract was to be performed in Illinois and that the parties recognized this fact. As the question of the applicability of the law of Ohio was not presented, the District court's only concern was whether Illinois or Missouri law applied. Regardless of the approach to the problem, therefore, the District court properly applied Missouri rather than Illinois law.

 Under Missouri law plaintiffs were entitled to 6% interest from date of demand, R.S.Mo.1939, Sec. 3226, Mo.R.S.A., regardless of whether their claims were liquidated. Trimble v. Kansas City P. & G. R. Co., 180 Mo. 574, 79 S.W. 678, 1 Ann.Cas. 363. Nor may interest be denied because plaintiffs failed to recover the full amount of their claim. Merkel v. St. Louis Hide & Tallow Co., Mo.App., 190 S.W. 611.

 The fact that defendant relied on a counterclaim and for that reason refused to pay that portion of plaintiffs' claim constituting a substantial portion of the amount eventually recovered by plaintiffs, did not relieve defendant of the obligation to pay interest. Dempsey v. Schawacker, 140 Mo. 680, 38 S.W. 954, 41 S.W. 1100; Lindenlaub v. Ozora Marble Quarries Co., Mo.App., 70 S.W.2d 1110, 1111. See also Bates County v. Wills, 8 Cir., 269 F. 734.

*The Counter-Claim.*

 Under "Points Relied Upon," defendant makes the following assignment of error:

"The court erred in finding against defendant on its counter claim. The evidence conclusively shows substantial damage suffered by defendant by reason of Southern's delay, and there is no evidence that defendant has not been or will not be required to pay the government damages by reason of delay on construction caused by Southern. Had there been such evidence, it would not have justified such holding by the court."

This assignment fails to call our attention to any specific finding of fact, ruling or conclusion of law. Cf. Hobbs Western Co. v. Employers' Liability Assurance Corporation, Ltd., of London, England, 8 Cir., 102 F.2d 32. No specific complaint is made of the District court's findings or its refusal of requested findings regarding the counterclaim. But assuming the sufficiency of the assignment to present for review the action of the District court in denying the claim for liquidated damages for delay, we are convinced that the court reached the proper decision. The subcontract provided that if plaintiffs should fail to perform the work within the time provided plaintiffs should pay to defendant "as and for liquidated damages and not as a penalty, the sum set forth in the contract specifications which said sum is $100 per day * * *." The subcontract also provided, "The subcontractor knows that the contractor must have his contract performed on or before the 1st of Aug. 1939, and it is, therefore, understood and agreed that the work provided for herein shall be entirely completed on or before Aug. 1, 1939." As we view these paragraphs they provide for payment of $100 per day by plaintiffs if defendant as a result of plaintiffs' delay was required to make such a payment to the government under the liquidated damages provisions of the general contract. That defendant itself so construed the contract is apparent on inspection of its letters to plaintiffs which reveal that defendant feared the imposition of liquidated damages provisions by the government and expected to hold plaintiffs responsible if they were imposed.

In determining whether damages provided for by contract are in the nature of liquidated damages or penalty and whether to apply a provision for such damages in a particular case, intention of the parties at the time of execution of the contract is of paramount importance. Thompson v. St. Charles County, 227 Mo. 220, 126 S.W. 1044; Zeppenfeld v. Morgan, Mo.App., 185 S.W.2d 898. The subcontract involved herein, viewed in the light of the circumstances under which it was executed, does not permit exaction of $100 per day for the delays encountered, regardless of actual damage that may have been sustained. As stated by the District court, "The evidence was neither substantial nor by any means conclusive that the defendant Henke Construction Company had suffered any loss from delay other than that usually attendant upon such undertakings." Application of the construction urged by defendant to the facts of the case would result in the imposition of a penalty. City of St. Louis to Use of Carroll-Porter Boiler & Tank Co. v. Parker-Washington Co. et al., 271 Mo. 229, 196 S.W. 767.

Defendant's contention that there is no evidence that it had not paid or would not be required to pay liquidated damages to the government as a result of plaintiffs' delay is not convincing. The short answer is that the burden of proof on the counterclaim rested on defendant and defendant offered no evidence of such a payment or possibility thereof. The District court stated in its memorandum opinion that defendant was not required to respond to the government for delay, and we find nothing in the record to the contrary.

The record confirms that this case was tried with most painstaking care by the trial court. All of the voluminous testimony and exhibits were received and considered, and at the conclusion of the trial the court prepared and submitted findings and conclusions together with opinion in writing which were submitted to opposing counsel with full opportunity to make objections, suggestions and requests. The opportunity was availed of by both parties and the findings, conclusions and judgment were not entered until the points raised had been argued and considered and modifications had been made in the light thereof. The trial court observed "The issues raised by both the pleadings and the evidence are largely if not totally factual," and reading of the voluminous record bears out the observation. The facts as found are supported by substantial evidence and neither of the appeals discloses reversible error.

The judgment appealed from is affirmed.