A. C. BURGER d/b/a Midwest Contractors-
Builders, Plaintiff-Appellant,

v.

Glenn E. WOOD and Lawrence P. Piper,
Defendants-Appellants.

Nos. 8869, 8872.

Springfield Court of Appeals.

Missouri.

Oct. 9, 1969.

Morgan M. Moulder, Camdenton, for plaintiff-appellant.

Neale, Newman, Bradshaw & Freeman, O. J. Taylor, Springfield, for defendants-appellants.

STONE, Judge.

This action was brought by plaintiff, A. C. Burger d/b/a Midwest Contractors-Builders, on an express oral contract with defendants, Glenn E. Wood and Lawrence P. Piper, pursuant to which plaintiff laid a hot mix asphaltic cement (asphalt) driveway from Route HH in Camden County, Missouri, to serve defendants' homes in Crestwood Acres, Horseshoe Bend Addition, a timbered tract bordering on that highway. By an affirmative plea of recoupment [1] in their answer, defendants

---

1. "Recoupment is the right of a defendant, in the same action, to cut down the plaintiff's demand either because the plaintiff has not complied with some cross obligation of a contract on which he sues or because he has violated some duty which the law imposes on him in the making or performance of that contract." 20 Am.Jur.2d Counterclaim, Recoupment, and Setoff § 1, p. 228. For other definitions of recoupment, see Russell v. Empire Storage & Ice Co., 332 Mo. 707, 725, 59 S.W.2d 1061, 1067(2); Schroeder v. Prince Charles, Inc., Mo., 427 S.W.2d 414, 419(5); 80 C.J.S. Set-Off and Counterclaim § 2, p. 5; 3 Williston on Sales § 605, 1. c. 334, 335.

charged plaintiff with defective workmanship and alleged that plaintiff was not entitled to a judgment "in excess of $4,000." Following trial to the court and submission of after-trial memoranda by counsel, judgment for plaintiff in the sum of $6,468.38 was entered against both defendants. All parties appeal.

The main driveway followed the path of a pre-existent drive sharply upgrade from Route HH over an irregularly sweeping curve (roughly resembling an inverted "U") to the hilltop home of defendant Wood. About midway along the route of the main driveway, a much shorter driveway branched from the main driveway (on the outside of its inverted "U" course) to serve the hillside home of defendant Piper. When the original oral contract was entered into, it was contemplated that the Piper driveway would terminate in a turnaround in front of the Piper home, with a narrow, elongated, unpaved island within the paved turnaround. Before work under the contract had been completed, the parties orally agreed that plaintiff would extend the Piper driveway to complete it as an irregularly semicircular way connecting with the main driveway at two points, instead of one as originally planned.

There has been and is no dispute concerning either the existence of the express oral contract or its terms and provisions, those here important, as stated in the trial court's findings of fact, being that "plaintiff was to furnish all equipment, labor and materials for the preparation of the necessary roadbed, placing and compacting of a three-inch crushed rock base on said roadway and placing of a two-inch asphalt surfaced driveway" and that the contract price to be paid by defendants to plaintiff for said work was to be $6,000 plus 3% sales tax of $180. Extension of the Piper driveway was treated as extra work under the express oral contract, to be completed in accordance with the same specifications and to be done on a time and materials basis for not more than $1,250.

Upon completion, plaintiff billed $1,153.58 for this extra work. Admittedly, defendants are jointly liable for whatever sum may be found payable to plaintiff in this action.

Measuring along the center of the driveways, plaintiff's witness Krehbiel, a deputy county surveyor and the only witness in this testimonial field, determined that the total length of both driveways was 1,369 lineal feet, of which 1,028 lineal feet were in the main driveway (as shown on his drawing in evidence) and 345 lineal feet were in the Piper driveway. The same witness found the entire paved area of both driveways to have been 2,724 square yards, of which approximately 2,140.7 square yards were in the main driveway and approximately 583.3 square yards (i. e., an area of 5,250 square *feet,* as stated positively by the witness, and thus 583.3 square *yards,* not 683.3 square yards, the erroneous quotient spawned by hasty division on the stand) were in the Piper driveway. Krehbiel's testimony also indicated that, of the 5,250 square feet or 583.3 square yards in the Piper driveway, approximately 3,181 square feet or 353.4 square yards were in that portion of the Piper driveway originally contemplated by the oral contract (hereinafter referred to as the original Piper driveway) while 2,069 square feet or 229.9 square yards were in the extension of the Piper driveway done as extra work (hereinafter referred to as the Piper driveway extension).

The significant findings of the trial court, of which plaintiff here complains, were (1) that plaintiff's work on the original Piper driveway "was defective in the following respects: plaintiff did not apply a full three-inch rock base, properly compacted, on all of drive . . . [and] did not apply a full two inches of asphalt pavement on all of said drive as agreed upon by the parties," and (2) "that the value of the work performed by plaintiff for defendants, taking into account the defective work on said Piper drive, and al-

lowance for sales tax amounted to the sum of $6,468.38." On these findings of fact, the trial court reduced plaintiff's principal demand of $7,333.58 (i. e., the sum of the original contract price of $6,000, the sales tax of $180, and $1,153.58 for the extra work) by $865.20, entered judgment for $6,468.38, and denied prejudgment interest. Asserting that he "fully performed his part of the contract in a workmanlike manner" and that defendants "failed in their burden of proving the affirmative defense of bad workmanship," *plaintiff* here insists that he was and is entitled to judgment for $7,333.58, with interest thereon at 6% per annum from October 16, 1965, the date of his initial demand for payment. On the other hand, *defendants* maintain that plaintiff's demand of $7,333.58 should have been reduced by $1,550 to $5,783.58 and that prejudgment interest properly was denied, and their supplication here is that we remand "with instructions to enter judgment in the amount of $5,783.58."

Much testimony and many exhibits were received upon trial; but, to confine this opinion within reasonable bounds, we will limit ourselves to recording those facts and considering those issues essential to proper determination of the respective appeals. Bloomfield Reorganized School Dist. No. R–14, Stoddard County v. Stites, Mo., 336 S.W.2d 95, 97; Southwest Engineering Co. v. Reorganized School Dist. No. R–9, Lawrence County, Mo.App., 434 S.W.2d 743, 746. The work originally contemplated by the express oral contract was done during the late Summer or early Fall of 1965. Before that work had been completed and during "the latter part of September or early October" (so plaintiff thought), the parties agreed upon the extra work to be done on the Piper driveway extension. After the main driveway had been paved, defendant Wood complained that "a too large aggregate" had been used in the asphalt and that rocks "up to an inch [in] size" were "showing up on the surface of the driveway." Although insisting that the aggregate used in the asphalt was not too large (it was "state specs ⅝ minus"—"that means you crush the rock into the crushers on screens and nothing larger than ⅝ [inch] can go through"), plaintiff agreed to satisfy Wood's complaint by adding "a sand finish" or (as it was more frequently referred to) a "cap coat" on the main driveway. No "cap coat" was applied on the Piper driveway.

Defendant Piper's hillside home was on the lower side of the elongated turnaround, and the bifurcated segment of the original Piper driveway between the Piper home and the lower side of the narrow, elongated, unpaved island within the paved turnaround (that segment being identified as the lower level) was lower than the bifurcated segment of the original Piper driveway on the opposite and upper side of the unpaved island (that segment being identified as the upper level). About ten days after the paving was finished, an area on the lower level began to "fracture." At defendant Piper's request, plaintiff "came over and looked at it," said that "he couldn't understand why it had given way like that," and "after a lengthy discussion" agreed to patch it, which he did. The dimensions of that area were given by plaintiff as 4 to 5 feet in length and 3 feet in width and by defendant Piper as 12 feet in length and 4 feet in width. Whatever its precise size may have been, defendant Piper made photographs (received in evidence) of this area after the fractured asphalt surface had been cut out, observed the base himself, and talked with plaintiff's employees doing the work. Without objection or motion to strike, Piper testified: "The base had not been put down correctly . . . . There was not enough base rock and it [the asphalt] apparently had been laid almost like a veneer in that area. And even the man who was then cutting this away and was putting this new base rock in said that when he was there before at the time they were paving it [he] had noticed there was

a spot that the base rock was not in his estimation, his thinking, as it should be, and there might be trouble, but he didn't say anything to anyone."

Within 1½ to 2 months after plaintiff's patchwork, other areas in the original Piper driveway "began to crack and suddenly deteriorate." The testimony of defendant Piper, the only witness who undertook to particularize concerning these areas, was in some respects confused and confusing, and we have been unable to reconcile and correlate all of his testimony with the several photographic exhibits taken on June 24, 1966, and on October 10, 1967, to which he and counsel frequently (and sometimes mistakenly) alluded. As best we can unravel the entangled record, three other fractured areas developed, to wit, (1) an area 18 feet by 6 feet adjoining or near that patched by plaintiff on the lower level of the turnaround, (2) an area 6 feet 8 inches by 4 feet 5 inches on the upper level of the turnaround, and (3) another area of undisclosed dimensions on the upper level. It *is* plain from defendant Piper's testimony that the area 18 feet by 6 feet on the lower level was patched by one Gamble (not called as a witness) during October 1967, that he (Piper) observed conditions in that area and recorded them on a movie film shown in the trial court, and that he paid Gamble "approximately 550 some-odd dollars" for his patchwork. According to Piper, the thickness of the original asphalt surface in the area patched by Gamble "varied from three-fourths of an inch to an inch and a half, with no base underneath it at all, no base rock at all . . . just [lying] on the original ground." Piper also brought into the trial court a number of pieces of asphalt described as being only ¾ inch to 1¼ inches in thickness and identified as cross sections of the asphalt surface in the two fractured areas on the upper level of the turnaround.

To support his categorical asseveration that his work on this paving project "was done in good workmanlike manner and ac-

tually exceeded the requirements of the contract," plaintiff produced a bundle of weight tickets reflecting aggregate deliveries of 446.5 tons of crushed rock and 466.5 tons of asphalt, and then adduced evidence from witness Krehbiel that 449.5 tons of crushed rock, *if spread evenly*, would have been sufficient to have provided a 3-inch rock base for the entire paved area of 2,724 square yards in both driveways, and that an identical tonnage of compacted asphalt would have poured a "slab 3 inches thick" over the same area.

With respect to the fragmented areas in the upper and lower levels of the turnaround, plaintiff's theory, as epitomized in his statement of facts, was "this defect was caused by underground water drainage and seepage." Plaintiff himself so testified emphatically, but his witnesses were by no means as positive in their expressions of opinion. When asked what "caused the necessity" of the patchwork on the lower level of the turnaround, witness Hanks, an asphalt paving contractor, said "it is a base failure," the cause of which "generally . . . is water and clay combination, it is moisture." And to the inquiry "will drainage from the area above the [retaining] wall [on the uphill side of each level of the turnaround] seep down below the base of the walls and cause the failure on the base underneath [the] pavement," the reserved reply was "well, it could . . . moisture is generally the cause of failure." In response to the suggestion on cross-examination that "your comment and testimony concerning water gathering under this pavement . . . is speculation on your part, is it not, that this is what happened," witness Hanks readily agreed, "it would have been, you would have to open it up and look." Plaintiff's other witness on this subject, one Osborne, a former maintenance employee of the Missouri State Highway Department, who had observed the original Piper driveway about five weeks before trial, found "there was a base failure evidenced . . . water or

something in underneath there." As to the cause of that base failure, Osborne's initial cautious response was that "well, being under the hill, there is always a chance that you have a wet weather spring and water would seep in under and it would pocket and . . . cause a soft spot" but later expressed "my opinion that water pocketed in under there is what caused that." On cross-examination, Osborne agreed with counsel that "you have to have a base or foundation for your asphalt" and, if there was no rock base under the asphalt he had inspected, that was a "possible" cause of the surface breakdown.

■ In urging that the trial court erred in finding that his work was defective, plaintiff asserts that his evidence "clearly showed" that the fractured areas of the original Piper driveway were "caused by water seepage and drainage from the hillside and [were] inherent in the nature of the work." We agree with plaintiff that the burden of establishing the affirmative defense of recoupment rested upon defendants [Rule 55.10; § 509.090; Brush v. Miller, Mo.App., 208 S.W.2d 816, 821(12); Blickhan v. Trans World Airlines, Mo.App., 305 S.W.2d 743, 746(5)];[2] that a mere showing of the existence of fractured areas did not suffice, in and of itself, to establish the affirmative defense of recoupment [Freeman Contracting Co. v. Lefferdink, Mo.App., 419 S.W.2d 266, 275(19)]; and that, absent any indication that by reason of education or specialized experience either defendant possessed special skill or knowledge with respect to the matter involved so superior as to make his opinion a fact of probative value [32 C.J.S. Evidence § 457, p. 98], neither defendant was qualified to offer opinion evidence as to what had caused the fractured areas. Levin v. Hilliard, Mo., 266 S.W.2d 573, 576(2).

However, plaintiff's presentation ignores or overlooks the defects found by the trial court and supported by *defendants'* evidence. Those defects were that "plaintiff did not apply a full three-inch rock base, properly compacted, on all of drive . . . [and] did not apply a full two inches of asphalt pavement on all of said drive as agreed upon by the parties." As we have recorded, defendant Piper from personal observation testified that the asphalt surface on the area patched by Gamble "varied from three-fourths of an inch to an inch and a half, with no base underneath it at all, no base rock at all . . . just [lying] on the original ground" and also produced exhibits identified as cross sections of the asphalt surface in the fractured areas on the upper level of the turn-around indicating that the thickness of the asphalt surface there varied from $\frac{3}{4}$ inch to $1\frac{1}{4}$ inches and thus was within the same contractually substandard range. The competency and admissibility of this evidence was not, and could not well have been, challenged. As the parties agreed and the trial court found, the express oral contract contemplated and required the placing and compacting of a three-inch crushed rock base and a two-inch asphalt surface. When asked on cross-examination "would you agree with me if the area was surfaced with not over one inch of asphalt and with one inch or less of rock base that this would be inadequate paving and not within your agreement with [defendants]," plaintiff signified his concurrence with the laconic response, "if that was so."

■ Although we "review the case upon both the law and the evidence as in suits of an equitable nature" [Rule 73.01(d); § 510.310(4)] and, on such review de novo, reach our own conclusions as to the weight of the evidence [Hampton v. Niehaus, Mo., 329 S.W.2d 794, 800(6); Trotter v. Trotter, Mo., 316 S.W.2d 482, 484(2); Masterson v. Plummer, Mo.App.,

---

2. All references to rules are to the Supreme Court Rules of Civil Procedure, ■

V.A.M.R., and all statutory references are to RSMo 1959, V.A.M.S.

343 S.W.2d 352, 354(1)], in the discharge of our appellate function we must respect the pointed admonitions that due regard should be given to the superior opportunity of the trial court to judge of "the credibility and characteristics of the witnesses who testified before him" [Peine v. Sater, Mo., 289 S.W.2d 101, 102(1); Spaeth v. Larkin, Mo., 325 S.W.2d 767, 771(3); Bourne v. Manley, Mo.App., 435 S.W.2d 420, 429(15)—see Rule 73.01(d); § 510.310 (4)], and that we should not reject a finding of fact by the trial court unless we can point to some good reason for doing so [Bodine v. Wood Tech Corp., Mo.App., 423 S.W.2d 193, 195(2); Loague v. Loague, Mo.App., 407 S.W.2d 92, 101(5)] or are compelled by the record to conclude that such finding is clearly erroneous. Ramacciotti v. Joe Simpkins, Inc., Mo., 427 S.W.2d 425, 433(11); In re Franz' Estate, Mo., 372 S.W.2d 885, 900(7). Determining that there was substantial evidence from which the trial court reasonably could have found that instant plaintiff's work was defective in the hereinbefore-quoted particulars, that finding is accepted and affirmed.

We proceed to a consideration of the respective complaints of the parties concerning the amount of the judgment. Our acceptance of the trial court's finding that plaintiff's work on the original Piper driveway was defective in certain respects requires rejection of his appellate complaint that the court erred in refusing to enter judgment in the principal sum of $7,333.58 as demanded; but, for reasons shortly to be noted, it does not follow either that the judgment for the reduced sum of $6,468.38 should be affirmed or that defendants' plea for remand with instructions to enter judgment for $5,783.58 should be granted. Although plaintiff's counsel specifically requested before submission that the trial court "draft an opinion or declaration of the law applicable to this case and include therein a statement of the grounds for its decision and its methods of determining any amount awarded" [Rule 73.01(b); § 510.310(2)], neither the court's findings of fact nor its conclusions of law afford any clue as to the method by which the court arrived at the deduction of $865.20 or the net figure of $6,468.38, and our meticulous review of the transcript sheds no light on this enigma.

Predicated on the fundamental principle that a party is entitled to have what he contracts for or its equivalent [13 Am.Jur.2d Building and Construction Contracts § 79, p. 79; Walter v. Huggins, 164 Mo.App. 69, 80, 148 S.W. 148, 152; Wright v. Sanderson, 20 Mo.App. 534, 540], the appropriate measure of damages in the case at bar where the defects may readily be remedied by repairs is, as stated in defendants' brief, *"the amount that would reasonably be required to remedy the defects and make the [driveway] conform to the plans and specifications."* [3] (Emphasis ours.) The only evidence even slanted in that direction was that of defendant Piper (a) that during October 1967 one Burger in "a cold patch type of operation" had repaired a fractured area 18 feet by 6 feet on the lower level of the turnaround, for which Piper had paid Burger "approximately 550 some-odd dollars" and (b) that other areas needed repairs, the probable cost of which was discussed by Piper in this loose, indefinite fashion: "I don't know how much it would cost, I would guess another thousand dollars . . . . In proportion to what we have already spent for an area [patched by Burger] I would say that if the same cost holds true it would be another thousand dollars for the same work."

3. Talbot-Quevereaux Const. Co. v. Tandy, Mo.App., 260 S.W.2d 314, 316(1). To the same effect, see Haysler v. Owen, 61 Mo. 270, 274–275(4); Walter v. Huggins, 164 Mo.App. 69, 79, 148 S.W. 148, 151; Spink v. Mueller, 77 Mo.App. 85, 93(4); Fletcher v. Milburn Mfg. Co., 35 Mo.App. 321, 328; Wright v. Sanderson, 20 Mo.App. 534, 540; 22 Am. Jur.2d Damages § 49, p. 78; 25 C.J.S. Damages § 76, l. c. 861–862; 5 Corbin on Contracts § 1089, l. c. 485.

The permissible extent of defendant's recoupment was the *reasonable* cost of making the driveway conform to the specifications, not what defendant Piper may have paid or, predicated on that payment, may "guess" he will pay. Fletcher v. Milburn Mfg. Co., 35 Mo.App. 321, 328; Storck v. Mesker, 55 Mo.App. 26, 36; 25 C.J.S. Damages § 76, l.c. 862. Bearing in mind that the defects shown by defendants' evidence and found by the trial court were that "plaintiff did not apply a full three-inch base, properly compacted . . . [and] did not apply a full two inches of asphalt pavement on all of said drive . .", the mere showing that defendant Piper paid "approximately 500 some-odd dollars" to Burger for repairing a certain area in "a cold patch type of operation" was insufficient to have permitted findings either (a) that the work done by Burger was, or that contemplated in the future would be, no more than that required "to remedy the defects and make the [driveway] conform to the plans and specifications" or (b) that "approximately 550 some-odd dollars" would have been a reasonable charge for such work in the area patched by Burger or, for that matter, that it was a reasonable charge for the work actually done by Burger, whatever that may have been, or (c) that defendant Piper's guesstimate of $1,000 for repairs allegedly needed in other areas would be a reasonable charge for remedying defects there. Being unable, on the record here presented, to determine the amount by which plaintiff's demand of $7,333.58 should be cut down by defendants' recoupment, it becomes necessary to remand the cause for retrial of that issue. Julian v. Kiefer, Mo.App., 382 S.W.2d 723, 730; Freeman Contracting Co. v. Lefferdink, supra, 419 S.W.2d at 276(23).

With a view to facilitating final disposition of this prolonged controversy, we add these comments concerning plaintiff's point that the trial court erred in failing to allow prejudgment interest. Section 408.020 provides, inter alia, that "[c]reditors shall be allowed to receive interest at the rate of six per cent per annum, when no other rate is agreed upon . . . on accounts after they become due and demand of payment is made; . . . ." As used in this statute, "account" is regarded as equivalent to "claim" or "demand." Coleman v. Kansas City, 351 Mo. 254, 265–266, 173 S.W.2d 572, 576(3, 4); Coleman v. Kansas City, 353 Mo. 150, 162, 182 S.W.2d 74, 78(11); Brink v. Kansas City, 358 Mo.(banc) 845, 852, 217 S.W.2d 507, 511. Hence, instant plaintiff's demand predicated on an express oral contract was an "account" within the contemplation and meaning of Section 408.020.

Defendants' argument against allowance of interest rests primarily upon their contention that, "although the contract price was agreed upon," they were entitled under their plea of recoupment to have that figure reduced in some (as yet undetermined) amount, for which reason plaintiff's demand could not become liquidated prior to final judgment. As defendants emphasize, it is stated as a broad general rule that, in the absence of an agreement to the contrary, interest is not recoverable on an unliquidated demand. St. Louis Housing Authority v. Magafas, Mo., 324 S.W.2d 697, 700(4); Wolfersberger v. Miller, 327 Mo. 1150, 1166, 39 S.W.2d 758, 765(16); 47 C.J.S. Interest § 19a, p. 28. But in its interpretation and application this rule is by no means so comprehensive and preclusive as at first blush it might appear to be. For example, (a) even though a demand may be unliquidated in the sense that it is in quantum meruit for the reasonable value of services rendered or labor and materials furnished, it is not unliquidated within the contemplation and meaning of the broad general rule and interest may be recovered thereon [Mid-West Engineering & Const. Co. v. Campagna, Mo., 421 S.W.2d 229, 234 (6); Laughlin v. Boatmen's Nat. Bank of St. Louis, 354 Mo. 467, 189 S.W.2d 974, 978(12), 979(15, 19)]; (b) a demand usually is regarded as liquidated and interest thereon is allowed where the amount due is readily ascertainable by computation or

determination according to a recognized standard [Komosa v. Monsanto Chemical Co., Mo., 317 S.W.2d 396, 400(5); 47 C.J.S. Interest § 19b, l.c. 31; 25 C.J.S. Damages § 52b, l.c. 798]; and (c) interest may be allowed to a plaintiff even though it be found he is not entitled to the full amount of his demand. Schmidt v. Morival Farms, Mo., 240 S.W.2d 952, 955, 956, 961(22); Merkel v. St. Louis Hide & Tallow Co., Mo.App., 190 S.W. 611, 612(2); United States for Use and Benefit of Lichter v. Henke Const. Co., 8 Cir. (Mo.), 157 F.2d 13, 24(18).

■ In the same spirit, it is said that the right of one party to recover interest on a liquidated demand is not necessarily dependent upon a showing that all claims interposed by his adversary are likewise liquidated. Cannon v. Bingman, Mo.App., 383 S.W.2d 169, 173(6); Vannorsdel v. Thompson, Mo.App., 323 S.W.2d 252, 254. And there is an abundance of authority declaring or demonstrating that where plaintiff's demand is liquidated, the interposition of an unliquidated counterclaim or set-off does not convert the liquidated demand into an unliquidated one or preclude plaintiff's recovery of prejudgment interest, even though such counterclaim or set-off puts the amount payable in doubt.[4] Since a "counterclaim" is regarded and defined as "a counterdemand existing in favor of a defendant against a plaintiff and includes set-off and recoupment" [Schroeder v. Prince Charles, Inc., Mo., 427 S.W.2d 414, 419(4); Standard Insulation & Window Co. v. Dorrell, Mo.App., 309 S.W.2d 701, 704(3)—see Fricke v. W. E. Fuetterer

Battery & Supplies Co., 220 Mo.App. 623, 628, 288 S.W. 1000, 1002(5)], the same principle is applicable where, as here, defendants' plea is in recoupment. "In short," as Professor McCormick pointed out, "it is the character of the claim and not of the defense that is determinative of the question whether an amount of money sued for is a 'liquidated sum.'" McCormick, Damages § 54, l.c. 216 (1935). If this were not true, prejudgment interest would never be allowable when the precise principal amount of the recovery is placed in doubt by the filing of a counterclaim, set-off or plea of recoupment [Beck v. Lawler, Tex.Civ.App., 422 S.W.2d 816, 820]—a result particularly out of character where defendants rely upon a plea of recoupment, which is equitable in nature [80 C.J.S. Set-Off and Counterclaim § 2, l.c. 6] and designed to reduce plaintiff's demand only "so far as in reason and conscience it ought." 20 Am.Jur.2d Counterclaim, Recoupment, and Setoff § 6, p. 231.

In the case at bar, plaintiff's demand is liquidated for all parties recognize that "the contract price was agreed upon" and that "the total contract price" was $7,333.58. The matter in controversy is whether that contract price should be cut down or reduced under defendant's plea of recoupment, plaintiff insisting that it should stand without diminution while defendants contend that it should "be reduced by $550 for repairs . . . already . . . made and by $1,000 for those yet to be made" to $5,-783.58. In this connection, it may be noted that, when at the trial on June 12, 1968, some two years eight months after plaintiff

---

4. Schmidt v. Morival Farms, Mo., 240 S.W.2d 952, 955, 956, 961(21, 22); Stephens v. Burgess, 69 Mo. 168; Vannorsdel v. Thompson, Mo.App., 323 S.W.2d 252, 254(1); Eastmount Const. Co. v. Transport Mfg. & Equip. Co., 8 Cir. (Mo.), 301 F.2d 34, 42–43(12, 13); United States for Use and Benefit of Lichter v. Henke Const. Co., 8 Cir. (Mo.), 157 F. 2d 13, 24(19); Fluor Corp. v. United States ex rel. Mosher Steel Co., 9 Cir. (Ariz.), 405 F.2d 823, 830(12), certiorari denied 394 U.S. 1014, 89 S.Ct. 1632, 23 L.

Ed.2d 40; H. & M. Heating Co. v. Andrae, 35 Wis.2d 1, 150 N.W.2d 379, 386 (17); Farrington v. Freeman, 251 Iowa 18, 99 N.W.2d 388, 392(5, 6); Robert E. Lee & Co. v. Commission of Public Works of City of Greenville, 248 S.C. 92, 149 S.E.2d 59, 63(3–5); Hansen v. Covell, 218 Cal. 622, 24 P.2d 772, 775–776(7), 89 A.L.R. 670; Rubel v. Rubel, 221 Miss. 848, 75 So.2d 59, 69(10), 47 A.L.R. 2d 1410; annotation 89 A.L.R. 678; annotation 3 A.L.R. 809; 47 C.J.S. Interest § 19b, l.c. 31.

had finished this paving job in October 1965, defendant Piper was asked on cross-examination whether "the only defect that you are complaining of here is that part [of the original Piper driveway] in front of your house and garage there and spots [i. e., fractured areas] that appear in plaintiff's Exhibit 4 [a kodak picture showing portions of the upper and lower levels of the turnaround] . . . is that all you are complaining about this whole job," the unambiguous, unequivocal answer was "yes, sir." These fractured areas in their aggregate comprised but a portion (relatively small as best we can determine) of the original Piper driveway, which in its entirety contained only 353.4 square yards and thus barely 13% of the whole paved area of both driveways. And the presently-claimed and still-unestablished extent of recoupment is $1,550, only about 21% of the total contract price of $7,333.58 and not much more than four years' simple interest at 6% per annum on the $5,783.58 for which defendants now seek entry of judgment in full satisfaction for plaintiff's paving job of four years ago.

■ Since the evidence upon retrial may not be anticipated, we need not discuss defendant's suggestion that the trial court's failure to allow interest was proper because plaintiff did not show when the contract price was to be paid. Suffice it to record here our conclusion that, upon retrial, judgment should be entered for plaintiff in a principal amount, which should be the balance of the total contract price of $7,333.58 after deduction therefrom of the sum found to be properly allowable upon defendants' plea of recoupment, with interest at 6% per annum upon such principal amount from and after the date on which the evidence may show it to have become due and payment thereof to have been demanded.[5]

The cause is remanded for determination of the amount properly allowable upon defendants' plea of recoupment and for entry of judgment in conformity with the views hereinbefore expressed. Each side having, on these consolidated appeals, been granted some, but denied other, relief as prayed, the costs on the consolidated appeals are taxed share and share alike, that is, one-half against plaintiff and one-half against defendants.

HOGAN, P. J., and TITUS, J., concur.

---

5. Sec. 408.020; Schmidt v. Morival Farms, supra note 4, 240 S.W.2d at 961; Fluor Corp. v. United States ex rel. Mosher Steel Co., supra note 4, 405 F.2d at 830 (13); Robert E. Lee & Co. v. Commission of Public Works of City of Greenville, supra note 4, 149 S.E.2d at 63(3); Manning v. Clark, Fla., 89 So.2d 339, 341(2); 47 C.J.S. Interest § 19b, l.c. 31.